Filed 3/28/18; Opinion following rehearing

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | G052282 |
|        v. | (Super. Ct. No. 10CF0100) |
| ADRIAN RAPHAEL VELA, | O P I N I O N |
|     Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, John Conley, Judge. Judgment conditionally reversed; remanded with directions.

Sharon M. Jones and Patricia Ihara, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Collette Cavalier, Elizabeth M. Carino and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

\*         \*         \*

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of all of part II and subparts A., B., and C. of part III.

# I

## INTRODUCTION

Sixteen-year-old defendant Adrian Raphael Vela and one of his fellow gang members "hit up" (confronted) two suspected rival gang members. Vela's accomplice pulled out a gun and shot the two victims, killing one of them. The prosecutor directly filed charges against Vela in "adult" criminal court. The jury found Vela guilty of murder, attempted murder, and found true the related firearm and gang allegations.

Vela makes several interrelated claims of instructional error concerning accomplice liability. Vela also raises two constitutional challenges to his 72 years to life sentence. In the unpublished parts of this opinion, we will find that the trial court committed no instructional errors. Further, Vela's sentence does not violate either the equal protection clause or the Eighth Amendment.

In the published portion of this opinion, we conditionally reverse the judgment. Due to the electorate's recent approval of Proposition 57, which emphasized juvenile rehabilitation, prosecutors can no longer directly file charges against a minor in an "adult" criminal court. Only a juvenile court judge can determine whether a minor can be prosecuted and sentenced as an adult, after conducting a transfer hearing, taking into account various factors such as the minor's age, maturity, criminal sophistication, and his or her likelihood of rehabilitation. We also address the retroactivity of Senate Bill No. 620 (2017-2018 Reg. Sess.) as enacted, which made changes to two firearm sentencing enhancement statutes, Penal Code sections 12022.5, subdivision (c), and 12022.53, subdivision (h). (Stats. 2017, ch. 682, §§ 1, 2, eff. Jan. 1, 2018.)

We find that Vela is retroactively entitled to a transfer hearing because his case is not yet final on appeal. If, after conducting the hearing, the juvenile court judge determines that Vela's case should be transferred to a court of criminal jurisdiction, then his convictions will be reinstated. The court is then to resentence Vela within the bounds of its discretion as discussed further within this opinion. But if the juvenile court

2

determines that Vela is amenable to rehabilitation, and should remain within the juvenile justice system, then his convictions will be deemed juvenile adjudications. The juvenile court is then to impose an appropriate disposition within its discretion under juvenile court law.

## II

## FACTUAL AND PROCEDURAL BACKGROUND

On January 23, 2009, Christopher Ochoa was at Vela's apartment in Anaheim. Ochoa and Vela are both members of 7th Street, a relatively small criminal street gang located in Santa Ana. The gang claims the territory of 6th and 7th Streets and marks that area with the gang's graffiti. Seventh Street's main rival is F-Troop, a gang that claims the territory that surrounds 7th Street's turf. Members of 7th Street felt it important to let people know who was in charge of its neighborhood.

At around noon, Hector Martinez drove to Vela's apartment. Martinez was a long-time associate of the 7th Street gang. Vela and Ochoa asked Martinez to take them "cruising" to Santa Ana to look for members of F-Troop and to look for rival gang tagging in 7th Street's turf. Ochoa wore gloves and indicated he had a gun. Martinez drove Vela and Ochoa to Santa Ana.

When they arrived in Santa Ana, Martinez drove around 7th Street's territory. As they were cruising the area, they talked about Ochoa's gun and were looking for rival gang members and rival graffiti. Vela and Ochoa asked Martinez to stop because they saw two males (later identified as Martin Herrera and David Frias) whom they suspected to be rival gang members. Martinez made a U-turn and pulled into the parking lot of an apartment complex. When Martinez stopped the car, Vela got out and said that he was going to "hit these guys up." As Vela walked towards Herrera and Frias, Martinez backed his car into a parking space so that it was facing towards the street.

3

After about four minutes, Ochoa loaded his gun, concealed it under his clothing, and got out of the car to check on Vela.

Martinez stayed in the car and could not clearly see what was going on because there was a tree blocking his view. But Martinez was able to see some gesturing as if words were being exchanged between Vela, Ochoa, Herrera, and Frias. During the confrontation, Vela and Ochoa stood side-by-side, about three feet away from Herrera and Frias. Ochoa then pulled out his gun and Herrera raised his hands in surrender. Ochoa shot Herrera in the head, killing him. Ochoa shot Frias in the face.

Vela and Ochoa immediately ran back to Martinez's car and got in. Ochoa was still holding the gun and placed it in his lap. Ochoa told Martinez to hurry up and leave. In an excited voice, Vela said, "Did you see those fools crying for their life?" Martinez got on the freeway and headed towards Anaheim. Once they were in Anaheim, Ochoa leaned out the window and threw the bullets from the gun into a sewer drain on the side of the street. Martinez drove to a friend of Vela's house located somewhere in Anaheim where Vela and Ochoa buried the gun in the backyard.

Two days later, the police arrested Martinez. A witness had written down the license plate number of his car and called 911. Initially, Martinez did not tell the police who was involved in the shooting because he feared retaliation and being labeled a "rat." Vela and Ochoa had told him, "Don't say nothing." However, about nine months later, Martinez agreed to testify in exchange for a 13-year sentence.

The prosecution charged Vela in a three-count information with murder, attempted murder, and being an active participant in a criminal street gang. (Pen. Code, §§ 187, 664, subd. (a), 186.22, subd. (a).) The prosecution alleged that the murder and the attempted murder were committed for the benefit of a criminal street gang, and that during the commission of the gang-related murder and attempted murder, another principal intentionally discharged a firearm causing death and great bodily injury. (Pen. Code, §§ 186.22, subd. (b)(1), 12022.53, subds. (d) & (e)(1).)

4

A jury found Vela guilty of the charges and found true the allegations. The trial court sentenced Vela to an aggregate prison term of 72 years to life. The court imposed 15 years to life for the murder, 7 years for the attempted murder, and two 25-year-to-life terms for the gang-related firearm enhancements. The court stayed the sentence on the substantive gang offense. (Pen. Code, § 654.)

## III

## DISCUSSION

### A. *Natural and Probable Consequences Jury Instruction Claim*

"We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. [Citation.] Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] '"In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given." [Citation.]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

In California, criminal liability extends not only to direct perpetrators of crimes, but also to any accomplices. (Pen. Code, § 31.) When a defendant commits a crime with an accomplice, he is not only directly liable for any crimes he intends to commit (the target offenses), but he is also vicariously liable for any other crimes (nontarget offenses) committed by his accomplice that were a natural and probable consequence of the target offenses. (*People v. Olguin* (1994) 31 Cal.App.4th 1355.)

An objective test is used in determining "whether a particular criminal act was a natural and probable consequence of another criminal act." (*People v. Nguyen*

5

(1993) 21 Cal.App.4th 518, 531.) "Consequently, the issue does not turn on the defendant's subjective state of mind, but depends upon whether, under all of the circumstances presented, a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted by the defendant." (*Ibid.*)

A trial court properly instructs the jury on the natural and probable consequences doctrine when there is substantial evidence that a defendant and his accomplice committed a target offense, and when a jury could reasonably find that the nontarget offense committed by the defendant's accomplice was a "'natural and probable consequence'" of the target offense. (*People v. Prettyman* (1996) 14 Cal.4th 248, 269.) "Substantial evidence is evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (*People v. Barton* (1995) 12 Cal.4th 186, 201, fn. 8.)

Here, the trial court instructed the jury using the pattern instruction that explains the "natural and probable" consequences doctrine. (CALCRIM No. 403.) In relevant part, the instruction stated: "Before you may decide whether the defendant is guilty of murder under the natural and probable consequences theory, you must decide whether he is guilty of Disturbing the Peace by Fighting or Challenging Someone to Fight. [¶] To prove that the defendant is guilty of murder, the People must prove that: [¶] 1. The defendant is guilty of Disturbing the Peace; [¶] 2. During the commission of that crime, a coparticipant in that crime committed the crime of murder; [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the Murder was a natural and probable consequence of the commission of Disturbing the Peace."

The trial court also instructed the jury using the pattern instruction that explained the elements of the target crime of disturbing the peace. (CALCRIM No. 2688.) The instruction stated: "Here is the legal definition of disturbing the peace in

6

violation of Penal Code section 415 (1). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant willfully and unlawfully (fought/ or challenged someone else to fight); [¶] AND [¶] The defendant and the other person were (in a public place) when (the fight occurred/or the challenge was made). [¶] Someone commits an act willfully when he does it willingly or on purpose." The court further instructed the jury on the elements of the nontarget offenses (second degree murder and attempted murder). (CALCRIM Nos. 520, 600.)

Vela contends that: "There was insufficient evidence here to support an instruction suggesting it was reasonably probable that a hit-up would result in a murder." We disagree. Vela and Ochoa, both 7th Street gang members, asked Martinez to drive them around their gang's territory to look for rival gang members and rival graffiti. There was a discussion in the car about Ochoa having a firearm. When two possible rival gang members were spotted, Vela and Ochoa asked Martinez to stop and before getting out of the car, Vela said: "I'll be back, I'm going to go hit these guys up."

During the trial, a gang expert testified that: "A 'hit up' is when a member or members of a gang will confront a person or persons and ask them about their gang affiliation." He also testified that: "The chances of the probability of a conflict or violence is very, very high. Anything from being shot, to being beat up with a fist, or kicked." He further testified that within the gang subculture, fellow gang members are expected to provide "back up" and if they have a firearm, they are expected to use it during a "hit up" or a confrontation. Thus, there was evidence from which a jury could reasonably find that a murder (the nontarget offense) was a natural probable consequence of a "hit-up" under these circumstances.

Vela makes three additional interrelated claims of instructional error based on the "natural and probable" consequences doctrine. Vela contends that: 1) if the target offense is a misdemeanor, a murder cannot be the nontarget offense; 2) in such a case, the nontarget offense is limited to involuntary manslaughter; and 3) the trial court erred by

7

not instructing on involuntary manslaughter.  We disagree and shall address each contention in turn.

        1. *A murder can be a probable consequence of a misdemeanor*.

Under the natural and probable consequences doctrine, if the target offense is a misdemeanor, a murder or an attempted murder may be a natural and probable consequence based on the particular circumstances.  (See, e.g., *People v. Medina* (2009) 46 Cal.4th 913, 920-921 [target offense was simple assault; nontarget offenses of murder and attempted murder were natural and probable consequences]; *People v. Gonzales* (2001) 87 Cal.App.4th 1, 10-11 (*Gonzales*) [target offense was simple assault; nontarget offense of murder was a natural and probable consequence]; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1055 [target offenses were simple assault and disturbing the peace; nontarget offense of attempted murder was a natural and probable consequence].)

Again, Vela contends that if the alleged target offense is a misdemeanor, a nontarget offense of murder or attempted murder cannot be a natural and probable consequence.  But he cites no cases in support of that proposition.  Vela's argument appears to be based on improperly conflating the natural and probable consequences doctrine with the felony-murder rule.  While the natural and probable consequences doctrine concerns the vicarious liability of a defendant for the foreseeable crimes committed by a coparticipant, the felony-murder rule is an entirely different concept concerning the classification of crimes themselves (specifically homicide crimes).

        2. *The felony-murder rule has no application to this case*.

Generally, in order for a homicide crime to be classified as a murder, the defendant must have committed the killing with malice.  (Pen. Code, § 187.)  But under the felony-murder rule, if a killing occurs during the commission of a designated serious felony, or during the commission of an inherently dangerous felony, the killing may be

8

classified as either a first or second degree murder, even if the killing occurred unintentionally without malice. (Pen. Code, § 189; 1 Witkin, Cal. Criminal Law (4th ed. 2012) Crimes Against The Person, § 151, pp. 954-955.) And as a limitation to the felony-murder rule, if a killing occurs during the commission of an act not amounting to a felony, the crime can only be designated as an involuntary manslaughter. (Pen. Code, § 192, subd. (b).)

Vela claims that "an unlawful killing in the commission of a misdemeanor is involuntary manslaughter." While that is a correct statement of a limitation of the felony-murder rule, it does not limit the scope of Vela's accomplice liability under the natural and probable consequences doctrine. (See *People v. Culuko* (2000) 78 Cal.App.4th 307, 322 ["The natural and probable consequences doctrine operates independently of the . . . felony-murder rule"]; see also *People v. Chiu* (2014) 59 Cal.4th 155, 166 ["An aider and abettor's liability for murder under the natural and probable consequences doctrine operates independently of the felony-murder rule"].)

Here, the trial court instructed the jury on second degree murder with malice aforethought. Therefore, the jury necessarily found that Ochoa perpetrated the crimes of murder and attempted murder intentionally with malice aforethought and that Vela was vicariously liable as an accomplice. The felony-murder rule was simply not at issue in this case. And, as we shall explain further, the court had no obligation to instruct on the crime of involuntary manslaughter.

3. *The trial court had no duty to instruct on involuntary manslaughter.*

Generally, involuntary manslaughter is a lesser included offense of murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) Unlike murder, which ordinarily requires malice (Pen. Code, § 187, subd. (a)), involuntary manslaughter is an unlawful killing without malice that occurs during "the commission of an unlawful act, not amounting to a felony; or in the commission of a lawful act which might produce death,

9

in an unlawful manner, or without due caution and circumspection." (Pen. Code, § 192, subd. (b).)

A trial court's obligation in a criminal case is to "instruct on the general principles of law relevant to the issues raised by the evidence." (*People v. Earp* (1999) 20 Cal.4th 826, 885.) But a trial court has no sua sponte duty to instruct on a lesser included offense when there is no substantial evidence warranting the instruction. Substantial evidence in this context is evidence from which a reasonable jury could find "that the lesser offense, but not the greater, was committed." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) "If a killing is intentional, no involuntary manslaughter instructions may be given." (*People v. Dixon* (1995) 32 Cal.App.4th 1547, 1556.)

Here, based on the evidence presented to the jury, Vela and Ochoa asked Martinez to take them "cruising" to look for rival gang members in their gang's territory. During the confrontation, Vela and Ochoa stood side-by-side, about three feet away from Herrera and Frias. Ochoa pulled out his gun and Herrera raised his hands in surrender. Ochoa then shot Herrera in the head, killing him. Further, when Ochoa and Vela returned to the car, Vela said, "Did you see those fools crying for their life?"

In this case, there was no evidence from which a rational trier of fact could have found that Ochoa killed Herrera other than intentionally. That is, there was no evidence supporting an involuntary manslaughter instruction. In sum, the trial court committed no instructional errors.

*B. Equal Protection Claim*

When it has been pleaded and proved that a defendant in the commission of a murder or an attempted murder personally discharged a firearm causing death or great bodily injury, the trial court must impose an additional and consecutive sentence of 25 years to life. (Pen. Code, § 12022.53, subds. (a)(1) & (18), (d).) But in circumstances where the offense was committed for the benefit of a criminal street gang, the court must

10

impose the enhancement not only to those defendants who personally discharge the firearm, but also as to any aiders and abettors.  (Pen. Code, § 12022.53, subds. (d) & (e)(1).)

Here, the trial court imposed two consecutive 25-year-to-life sentences under the gang-related firearm enhancements.  (Pen. Code, § 12022.53, subds. (d) & (e)(1).)  Vela contends that the differential treatment of aiders and abettors in gang-related crimes—as opposed to aiders and abettors in other types of crimes—violates equal protection principles.  We disagree.

The Constitutions of both the United States and California guarantee equal protection of the laws.  (U.S. Const., 14th Amend.; Cal. Const., art. I, Pen. Code, § 7, subd. (a).)  As a threshold matter, to establish an equal protection claim, a defendant must show "that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner."  (*In re Eric J.* (1979) 25 Cal.3d 522, 530.) Generally, criminal defendants who commit different crimes are not similarly situated for equal protection purposes.  (*People v. Doyle* (2013) 220 Cal.App.4th 1251, 1266.)

Assuming that a defendant is similarly situated to other defendants, the rational basis test is then applicable to an equal protection claim involving an alleged sentencing disparity.  (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 882; see *People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1044 [rational basis for distinguishing those defendants who have discharged a firearm from a vehicle from those who have not]; *People v. Taylor* (2001) 93 Cal.App.4th 318, 322-323 [rational basis for distinguishing those defendants who are armed during an attempted robbery from those who are not].)  The challenged sentencing law will not be declared unconstitutional if the classification bears a rational relationship to a legitimate state purpose.  (*People v. Descano* (2016) 245 Cal.App.4th 175, 181-182.)

As Vela acknowledges, two other appellate courts have rejected identical equal protection challenges to the gang-related firearm enhancement in section 12022.53.

11

(*Gonzales*, *supra*, 87 Cal.App.4th pp. 12-13; *People v. Hernandez* (2005) 134 Cal.App.4th 474, 480-483 (*Hernandez* ).)  The court in *Gonzales* held that the additional punishment of aiders and abettors in gang-related firearm cases did not result in constitutionally infirm "disparate treatment."  (*Gonzales*, *supra*, 87 Cal.App.4th at p. 15.)  Similarly, the court in *Hernandez* concluded:  "Clearly the Legislature had a rational basis for imposing a 25-year-to-life enhancement on one who aids and abets a gang-related murder in which the perpetrator uses a gun, regardless of the relationship between the aider and abettor and the perpetrator.  As we previously observed, the purpose of this enhancement is to reduce through punishment and deterrence 'the serious threats posed to the citizens of California by gang members using firearms.'"  (*Hernandez*, *supra*, 134 Cal.App.4th at p. 483, fn. omitted.)

We agree with the reasoning of *Gonzales* and *Hernandez* and find no merit to defendant's equal protection claim.

*C. Cruel and Unusual Punishment Claim*

In recent years, the interpretation of the Eighth Amendment's prohibition against cruel and unusual punishments, particularly as it relates to the sentencing of juvenile offenders, has evolved.  A juvenile cannot be sentenced to capital punishment for any crime.  (*Roper v. Simmons* (2005) 543 U.S. 551, 578-579.)  A juvenile cannot be sentenced to life without the possibility of parole (LWOP) for a nonhomicide offense.  (*Graham v. Florida* (2010) 560 U.S. 48, 74-75.)  A juvenile cannot be sentenced to a term of years with a parole eligibility date that falls outside the juvenile's natural life expectancy (de facto life) for a nonhomicide offense.  (*People v. Caballero* (2012) 55 Cal.4th 262, 268.)  And a juvenile cannot be sentenced to mandatory LWOP even for a homicide offense.  (*Miller v. Alabama* (2012) 567 U.S. 460, 469-470.)  An LWOP sentence for a juvenile who commits a homicide offense is allowable only if the court considers the "'mitigating qualities of youth'" and limits "this harshest possible penalty"

12

to those "'rare juvenile offender[s] whose crime[s] reflect[] irreparable corruption.'" (*Id.* at pp. 476, 489, 479-480.)

In 2013, in response to these transformations in constitutional law, the California Legislature passed Senate Bill No. 260, which changed parole eligibility and parole considerations for youthful offenders. (Pen. Code, §§ 3051, 4801, subd. (c).) The current version of Penal Code section 3051, subdivision (a)(1), provides that: "A youth offender parole hearing is a hearing by the Board of Parole Hearings for the purpose of reviewing the parole suitability of any prisoner who was under 23 years of age at the time of his or her controlling offense." Juveniles sentenced to an indeterminate base term of 25 years to life will receive a hearing during their 25th year of incarceration. (Pen. Code, § 3051, subd. (b)(3).) The youth offender parole hearing "shall provide for a meaningful opportunity to obtain release." (Pen. Code, § 3051, subd. (e).) The Board of Parole Hearings "shall take into consideration the diminished culpability of juveniles as compared to that of adults, the hallmark features of youth, and any subsequent growth and increased maturity of the individual." (Pen. Code, § 3051, subd. (f)(1).)

Following the initial briefing in this case, the California Supreme Court clarified the impact of section 3051 on the sentencing of juvenile offenders to lengthy prison sentences. (*People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).) In *Franklin*, the court explained: "[S]ection 3051 has superseded [the 16-year-old defendant's] sentence so that notwithstanding his original term of 50 years to life, he is eligible for a 'youth offender parole hearing' during the 25th year of his sentence. Crucially, the Legislature's recent enactment also requires the Board not just to consider but to 'give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law.' (Pen. Code, § 4801, subd. (c).)" (*Id.* at p. 277.)

13

In *Franklin*, the court determined that the Legislature did not intend "that the original sentences of eligible youth offenders would be vacated." (*Franklin*, *supra*, 63 Cal.4th at p. 278.) Rather, the court noted that: "The Legislature has effected this change by operation of law, with no additional resentencing procedure required." (*Id.* at pp. 278-279.) The court thus concluded that defendant's constitutional challenge to his sentence was moot. (*Id.* at p. 280.) However, the court determined that it was "not clear whether [the defendant] had sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing." (*Id.* at p. 284.) As such, the court remanded the matter "for the limited purpose of determining whether [the defendant] was afforded an adequate opportunity to make" the appropriate record for use in a future youth offender parole hearing. (*Id.* at pp. 286-287.)

Here, we have circumstances very similar to those in *Franklin*, *supra*, 63 Cal.4th 261. Vela was 16 years old at the time of his offenses and the trial court imposed a lengthy aggregate sentence (72 years to life). But in the parties' supplemental briefs, they both agree that the holding of *Franklin* essentially moots Vela's challenge to his sentence as a cruel and unusual de facto life sentence under the Eighth Amendment.

However, even though Vela was sentenced after the effective date of section 3051, we will remand the matter in light of the clarifications of the statute as discussed in *Franklin, supra,* 63 Cal.4th 261. Similar to *Franklin*, the trial court is directed to determine whether Vela had an adequate opportunity to make a complete record of any relevant youth-related characteristics and circumstances at the time of his offenses. If not, both parties may put on the record any relevant evidence that demonstrates his "culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors." (*Id.* at p. 284.)

14

*D. The Effect of Proposition 57*

Although Vela was 16 years old when he committed these offenses, the Orange County District Attorney chose to file the charges directly in "adult" or criminal court. At that time, the district attorney was permitted to do so.

While this appeal was pending, Proposition 57, also known as "The Public Safety and Rehabilitation Act of 2016," became effective. Among other provisions, Proposition 57 amended the Welfare and Institutions Code so as to eliminate direct filing by prosecutors. Certain categories of minors—which would include Vela—can still be tried in criminal court, but only after a juvenile court judge conducts a transfer hearing to consider various factors such as the minor's maturity, degree of criminal sophistication, prior delinquent history, and whether the minor can be rehabilitated. (Welf. & Inst. Code, § 707, subd. (a)(1).)[1]

After we filed an unpublished opinion affirming the judgment, Vela filed a petition for rehearing contending that Proposition 57 applies retroactively to his case. (*In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).) Ordinarily, this court will not address an issue that has been raised for the first time in a petition for rehearing. (*People v. Holford* (2012) 202 Cal.App.4th 758, 759.) However, for good cause we may do so. (*Alameda County Management Employees Assn. v. Superior Court* (2011) 195 Cal.App.4th 325, 338, fn. 10.) This court granted the petition.

We hold that: 1) the amendments to the Welfare and Institutions Code that require a juvenile transfer hearing before a minor may be prosecuted and sentenced in a criminal court apply retroactively; and 2) the appropriate resolution is a conditional reversal dependent on the outcome of a juvenile transfer hearing on remand.

---

[1] Further undesignated statutory references will be to the Welfare and Institutions Code.

15

1. *Proposition 57 applies retroactively.*

The Legislature ordinarily makes laws that will apply to events that will occur in the future. Accordingly, there is a presumption that laws apply prospectively rather than retroactively. But this presumption against retroactivity is a canon of statutory interpretation rather than a constitutional mandate. (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1224.) Therefore, the Legislature can ordinarily enact laws that apply retroactively, either explicitly or by implication. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 311 (dis. opn. of Mosk, J.).) In order to determine if a law is meant to apply retroactively, the role of a court is to determine the intent of the Legislature, or in the case of a ballot measure, the intent of the electorate. (*People v. Conley* (2016) 63 Cal.4th 646, 659.)

a. *The purpose of the juvenile justice system is to rehabilitate minors.*

Before we consider the intent of Proposition 57, a brief discussion of some of the distinctions between the juvenile justice system and the criminal justice system is in order. Generally, all of the laws regarding juvenile delinquency proceedings are included within the Welfare and Institutions Code, while other code sections—primarily the Penal Code—define the offenses.[2] "Significant differences between the juvenile and adult offender laws underscore their different goals: The former seeks to rehabilitate, while the latter seeks to punish." (*In re Julian R.* (2009) 47 Cal.4th 487, 496.)

Generally, any person under the age of 18 who is charged with violating a law is considered a "minor." (§ 602.) A "juvenile court" is a separate, civil division of the superior court. (§ 246.) A prosecutor charges a minor with an offense by filing a juvenile petition, rather than a criminal complaint. (See §§ 653.7, 655.) Minors "admit"

---

[2] Notably, the presumption against retroactivity is incorporated within the preliminary provisions of the Penal Code and other code sections, but not within the Welfare and Institutions Code. (See Pen. Code, § 3; Civil Code, § 3; Code Civ. Proc. § 3.)

or "deny" an offense, rather than plead "guilty" or "not guilty." (§ 702.3.) There are no "trials," per se, in juvenile court, rather there is a "jurisdictional hearing" presided over by a juvenile court judge. (§ 602.) The jurisdictional hearing is equivalent to a "bench trial" in a criminal court. (See Cal. Rules of Court, rule 5.780.) Although a juvenile court judge adjudicates alleged law violations, there are no "convictions" in juvenile court. (§ 203.) Rather, the juvenile court determines—under the familiar beyond the reasonable doubt standard and under the ordinary rules of evidence—whether the allegations are "true" and if the minor comes within its jurisdiction. (See § 602 et seq.)

There is no "sentence," per se, in juvenile court. Rather, a judge can impose a wide variety of rehabilitation alternatives after conducting a "dispositional hearing," which is equivalent to a sentencing hearing in a criminal court. (§ 725.5; *In re Devin J.* (1984) 155 Cal.App.3d 1096, 1100.) In the more serious cases, a juvenile court can "commit" a minor to juvenile hall or to the Division of Juvenile Justice (DJJ), formerly known as the California Youth Authority (CYA). In order to commit a minor to the DJJ, the record must show that less restrictive alternatives would be ineffective or inappropriate. (*In re Teofilio A*. (1989) 210 Cal.App.3d 571, 576.) The DJJ, rather than the court, sets a parole consideration date. DJJ commitments can range from one year or less for nonserious offenses, and up to seven years for the most serious offenses, including murder. (See Cal. Code Regs, tit. 15, §4951-4957.) A minor committed to DJJ must generally be discharged no later than 23 years of age. (§ 607, subd. (f).)

### b. *Discretionary direct filing by prosecutors began with Proposition 21.*

Prior to Proposition 57, rather than filing a juvenile petition, a prosecutor could, for certain offenses, choose to directly file a criminal complaint against a minor 14 years of age or older in criminal court. (Former § 707, subd. (d), repealed by Initiative Measure (Prop 57, § 4.2, approved Nov. 8, 2016, eff. Nov. 9, 2016.) Discretionary direct filing was the result of a previous ballot measure, Proposition 21, the Gang Violence and

Juvenile Crime Prevention Act of 1998.  (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 549, 574 (*Manduley*).)  Among other provisions, "Proposition 21 revised the juvenile court law to *broaden the circumstances* in which minors 14 years of age and older can be prosecuted in the criminal division of the superior court, rather than in juvenile court.  [The initiative], authorize[d] specified charges against certain minors to be filed directly in a court of criminal jurisdiction, without a judicial determination of unfitness under the juvenile court law."  (*Ibid.*, italics added.)  In *Manduley*, the Supreme Court upheld Proposition 21 against a variety of challenges to the prosecutor's discretionary authority to directly file charges:  "The decision to file charges in criminal court [against a minor] is analogous to a prosecutor's decision to pursue capital charges against a defendant."  (*Id*. at p. 570.)

Proposition 21 included various findings and declarations, among them: "While overall crime is declining, juvenile crime has become a larger and more ominous threat"; "The rehabilitative/treatment juvenile court philosophy was adopted at a time when most juvenile crime consisted of petty offenses.  The juvenile justice system is not well-equipped to adequately protect the public from violent and repeat serious juvenile offenders"; "Juvenile court resources are spent disproportionately on violent offenders with little chance to be rehabilitated"; "Dramatic changes are needed in the way we treat juvenile criminals . . . if we are to avoid the predicted, unprecedented surge in juvenile and gang violence."  (Text of Proposition 21 <http://vigarchive.sos.ca.gov/2000/primary/propositions/21text.htm>.)

c. *The express intent of Proposition 57 was to emphasize juvenile rehabilitation.*

Sixteen years after Proposition 21, the electorate approved Proposition 57, which repealed both discretionary and mandatory direct filing by prosecutors and emphasized juvenile rehabilitation.  During that time there had been a sea change in

18

penology regarding the relative culpability and rehabilitation possibilities for juvenile offenders, as reflected in several judicial opinions. (See, e.g., *Graham v. Florida* (2010) 560 U.S. 48, 67 [a juvenile cannot be sentenced to life without the possibility of parole (LWOP) for a nonhomicide offense ]; see also *Miller v. Alabama* (2012) 567 U.S. 460, 469-470 [no more mandatory LWOP sentences for juveniles even for a homicide offense; there must be a consideration of youth-related factors in sentencing].) In *Miller*, the United States Supreme Court took note of the practice of prosecutors directly filing charges against minors: "The States next argue that courts and prosecutors sufficiently consider a juvenile defendant's age, as well as his background and the circumstances of his crime, when deciding whether to try him as an adult. But this argument ignores that many States use mandatory transfer systems. In addition, some lodge the decision in the hands of the prosecutors, rather than courts." (*Id.* at p. 463.)

In order to determine the intent of Proposition 57, we look not only to its provisions, but we may also look to the ballot materials in support of its passage. (See, e.g., *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 901 [official ballot pamphlet useful in interpreting voter initiatives].) Here, the ballot pamphlet "supporting Proposition 57 contains two express purposes related to juvenile offenders: 'Stop the revolving door of crime by emphasizing rehabilitation, especially for juveniles'; and 'Require a judge, not a prosecutor, to decide whether juveniles should be tried in adult court.' (Voter Information Guide, Gen. Elec. (Nov. 8, 2016) text of Prop. 57, Public Safety and Rehabilitation Act of 2016, § 2, p. 141.) In addition, the legislative analysis supporting Proposition 57 went so far as to state: 'the only way a youth could be tried in adult court is if the juvenile court judge in the hearing [under Welfare and Institutions Code section 707, subdivision (a)] decides to transfer the youth to adult court.'" (*People v. Superior Court* (*Lara*) (2017) 9 Cal.App.5th 753, 776-777, quoting Ballot Pamp., Gen. Elec. (Nov. 8, 2016) analysis of Prop. 57 by Legis. Analyst, p. 56, disapproved of on another point of law in *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 314.)

19

Proposition 57 also provided that: "This act shall be liberally construed to effectuate its purposes." (Ballot Pamp., Gen. Elec. (Nov. 8, 2016) text of Prop. 57, Public Safety and Rehabilitation Act of 2016, § 9, p. 146.)

Thus, while the intent of the electorate in approving Proposition 21 was to broaden the number of minors subject to adult criminal prosecution, the intent of the electorate in approving Proposition 57 was precisely the opposite. That is, the intent of the electorate in approving Proposition 57 was to broaden the number of minors who could potentially stay within the juvenile justice system, with its primary emphasis on rehabilitation rather than punishment.

*d. The implied intent of Proposition 57 was to retroactively extend its emphasis on juvenile rehabilitation to every minor to whom it could constitutionally apply.*

Although Proposition 57 plainly applies to minors whose charges are filed after its effective date, we must now determine whether it also applies retroactively. That is, does the electorate's express intent to emphasize juvenile rehabilitation extend to minors—such as Vela—who have been directly filed upon in criminal court by a prosecutor, but who were not given the benefit of a juvenile transfer hearing, and whose cases are not yet final on appeal?

When analyzing questions regarding retroactivity, we look primarily to our Supreme Court's opinion in *Estrada*, *supra*, 63 Cal.2d 740, for guidance. In *Estrada*, the defendant was initially convicted of a drug offense and was committed to a rehabilitation center. (*Id*. at pp. 742-743.) Estrada left the center at some point and was later captured and pleaded guilty to escape without force or violence. (*Id*. at p. 744.) At the time of his escape, the punishment for an escape was at least one consecutive year in prison. Further, there was also a statutory delay in an inmate's parole eligibility. But in Estrada's case, after his escape, but before his conviction, the Legislature amended the applicable

20

statutes. An escape without force or violence was now punishable by imprisonment in the state prison for a term of not less than six months, nor more than five years, with no delay in parole eligibility. (*Id*. at pp. 743-744.)

The Supreme Court reasoned that Estrada was "entitled to the ameliorating benefits of the statutes" as they had been amended. (*Estrada*, *supra*, 63 Cal.2d at p. 744.) The Supreme Court recognized "the general rule of construction, coming to us from the common law, that when there is nothing to indicate a contrary intent in a statute it will be presumed that the Legislature intended the statute to operate prospectively and not retroactively. That rule of construction, however, is not a straitjacket. Where the Legislature has not set forth in so many words what it intended, the rule of construction should not be followed blindly in complete disregard of factors that may give a clue to the legislative intent." (*Id*. at p. 746.)

In determining the lawmakers' intent, the Supreme Court found "one consideration of paramount importance. It leads inevitably to the conclusion that the Legislature must have intended, and by necessary implication provided, that the amendatory statute should prevail. When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Estrada*, *supra*, 63 Cal.2d at pp. 744-745.)

21

The Supreme Court further explained that: "'A legislative mitigation of the penalty for a particular crime represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law. Nothing is to be gained by imposing the more severe penalty after such a pronouncement; the excess in punishment can, by hypothesis, serve no purpose other than to satisfy a desire for vengeance. As to a mitigation of penalties, then, it is safe to assume, as the modern rule does, that it was the legislative design that the lighter penalty should be imposed in all cases that subsequently reach the courts.'" (*Estrada*, *supra*, 63 Cal.2d at pp. 745-746.)

Here, for a minor accused of a crime, it is a potential "ameliorating benefit" to have a neutral judge, rather than a district attorney, determine that he or she is unfit for rehabilitation within the juvenile justice system. While a district attorney has an obligation to be objective and impartial, the duty of that position is also to act as a zealous advocate. (*People v. Eubanks* (1996) 14 Cal.4th 580, 590.) And the impact of the decision to prosecute a minor in criminal court rather than juvenile court can spell the difference between a 16-year-old minor such as Vela being sentenced to prison for 72 years to life, or a discharge from the DJJ's custody at a maximum of 23 years of age. After the passage of Proposition 57, a juvenile court judge can only make that irrevocable decision after receiving a probation report and after conducting a full hearing considering the minor's prior history, the circumstances of the offense, and several other factors relating to his or her youth and immaturity. (§ 707, subd. (a).)

Applying the reasoning of *Estrada*, we find that by its approval of Proposition 57, and its rejection of Proposition 21, the electorate has "expressly determined" that the former system of direct filing was "too severe." Further, we find an "inevitable inference" that the electorate "must have intended" that the potential "ameliorating benefits" of rehabilitation (rather than punishment), which now extend to every eligible minor, must now also "apply to every case to which it constitutionally

22

could apply." (*Estrada*, *supra*, 63 Cal.2d at pp. 744-746.) As in *Estrada*, "to hold otherwise" we would have to conclude that the electorate was motivated "by a desire for vengeance" against Vela and similarly situated minors. That conclusion would be directly at odds with the intent of the electorate in its approval of Proposition 57.

    e. *The possibility for a minor's rehabilitation within the juvenile justice system is analogous to the possible reduction of a criminal defendant's sentence.*

    The Attorney General argues that "*Estrada*'s retroactivity rule only applies in the specific situation where the law unambiguously reduces a sentence or liability for a particular crime." The Attorney General contends that since Proposition 57 does not "unambiguously" reduce a sentence for a particular crime, the reasoning of *Estrada* does not apply. We disagree.

    We recognize, of course, that we are bound by the opinions of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) However, we do not interpret the holding, or ratio decidendi, of *Estrada* to be limited to its particular facts. "The fundamental rule for determining the precedential force and applicability of a case is to ascertain its true holding or *ratio decidendi*. The rule has been summarized as follows: 'The *ratio decidendi* is the principle or rule which constitutes the ground of the decision, and it is this principle or rule which has the effect of a precedent.'" (*Santa Monica Hospital Medical Center v. Superior Court* (1988) 203 Cal.App.3d 1026, 1033.) But a close reading of *Estrada* reveals that the Legislature did not unambiguously reduce the sentence for Estrada's particular crime: an escape without force or violence. (*Estrada*, *supra*, 63 Cal.2d at p. 743.)

    Again, in *Estrada*, the defendant had been convicted of an escape without force or violence under the then existing version of the escape statute. (*Estrada*, *supra*, 63 Cal.2d at p. 743.) On the day of Estrada's escape, the statute made no distinction between escapes with force or violence and escapes without force or violence. Every

23

defendant was required to be sentenced to a term of not less than one year in state prison consecutive to his or her commitment offense and a two-year minimum period for parole consideration after being returned to custody following an escape. (*Ibid.*) But prior to Estrada's case becoming final, the Legislature amended the escape and parole statutes. The sentence for an escape with force or violence remained the same. But a sentence for an escape without force or violence was now "'imprisonment in the state prison for a term of not less than six months *nor more than five years*.'" (*Ibid.*, italics added.) The Legislature also amended the parole statute to no longer require a minimum period before parole consideration following an escape. In Estrada's case, he was being held in custody because his parole eligibility had been delayed. (*Ibid.*)

However, the sentence for Estrada's particular crime—an escape without force or violence—was not "unambiguously reduced" by the amendment. That is, after the Legislature amended the escape statute, a court could still sentence a particular defendant to a one-year or greater consecutive sentence for a nonviolent escape and still have remained within the five-year sentencing range. Thus, the actual effect of the amendment was to create *the possibility* for a reduction in a defendant's sentence based on the discretion of the court and a defendant's particular circumstances.

When a change in the law allows a court to exercise its sentencing discretion more favorably for a particular defendant, the reasoning of *Estrada* applies. (*People v. Francis* (1969) 71 Cal.2d 66, 75-76 (*Francis*).) In *Francis*, the defendant had no prior record of narcotic offenses, but was convicted of possessing "four 'sandwich bag packages'" of marijuana. (*Id.* at pp. 70-71.) The court denied probation and sentenced the defendant to state prison for one to 10 years. (*Id.* at p. 75.) "While the instant case was pending on appeal, [the Health and Safety Code section] was amended to provide for alternative sentences of imprisonment in the county jail for not more than one year or in the state prison for one to ten years where no prior narcotics offenses are shown [citation]." (*Ibid.*) The Supreme Court applied the reasoning of *Estrada*, *supra*, 63

24

Cal.2d 740, and remanded the defendant's case "to the trial court to reconsider the matter of probation and sentence." (*Francis*, *supra*, 71 Cal.2d at p. 75.)

In *Francis*, the Attorney General argued that *Estrada* was distinguishable because the Legislature had not unambiguously reduced the defendant's sentence; rather, it had changed the crime from a straight felony to a "wobbler." (*Francis*, *supra*, 71 Cal.2d at p. 76.) The Supreme Court disagreed. "Here, unlike *Estrada*, the amendment does not revoke one penalty and provide for a lesser one but rather *vests in the trial court discretion* to impose either the same penalty as under the former law or a lesser penalty." (*Ibid.*, italics added.) The Supreme Court was persuaded that "the mere fact that the Legislature changed the offense from a felony to a felony-misdemeanor *conceivably might* cause a trial court to impose a county jail term or grant probation in a case where before the amendment the court denied probation . . . and sentenced the defendant to prison." (*Id.* at p. 77.) Thus, just as it had reasoned four years earlier in *Estrada*, the Supreme Court found that there was an "inference" that the Legislature intended the amendment to "apply to every case" to which it *might* constitutionally apply "because the Legislature has determined that the former penalty provisions *may have been too severe in some cases* and that the sentencing judge should be given wider latitude in tailoring the sentence to fit the particular circumstances." (*Id.* at p. 76, italics added.)

Here, the electorate has taken away from prosecutors the discretion to directly file cases against minors in criminal courts. As a result—similar to the discretion of a judge to reduce a crime from a felony to a misdemeanor *in some cases*—a juvenile court judge can now exercise his or her discretion *in some cases* and determine that a minor should remain in the juvenile justice system rather than face prosecution and sentencing in the criminal courts. For those minors who remain in the juvenile court, with its primary emphasis on rehabilitation rather than punishment, the potential effect of that "ameliorating benefit" is analogous to the potential reduction in a criminal defendant's sentence as in *Estrada* and *Francis*.

25

Our colleagues in the First District Court of Appeal, Division Four, addressed Proposition 57 under similar circumstances. (*People v. Cervantes* (2017) 9 Cal.App.5th 569 (*Cervantes*), disapproved of in *People v. Superior Court* (*Lara*), *supra*, 4 Cal.5th 299, 315.)[3] In *Cervantes*, a 14-year-old defendant had been tried and convicted in an "adult" criminal court, prior to the passage of Proposition 57, without a "transfer" or "fitness" hearing. The court reversed eight of the defendant's 15 convictions. (*Cervantes*, *supra*, 9 Cal.App.5th at p. 570.) The court held that Proposition 57 affords the defendant an opportunity for a fitness hearing on remand as to any counts to be retried, but *Cervantes* did not find that Proposition 57 applies retroactively under *Estrada*, *supra*, 63 Cal.2d 740. *Cervantes* held that "the Supreme Court has limited *Estrada* to statutory changes that mitigate the penalty for a particular offense." (*Cervantes*, *supra*, 9 Cal.App.5th at p. 600, original capitalization omitted.) We respectfully disagree. Again, in *Francis*, *supra*, 71 Cal.2d at page 76, the Supreme Court applied the reasoning of *Estrada* in a situation where a statutory change converted a crime from a straight felony into a wobbler. That is, in *Francis*, the Supreme Court applied the statutory change retroactively, even though did not necessarily mitigate the penalty for that particular crime for that particular defendant.

In *Cervantes*, the court also relied on *People v. Brown* (2012) 54 Cal.4th 314 (*Brown*), for the proposition that the reasoning of *Estrada*, *supra*, 63 Cal.2d 740, cannot be extended to any situation other than the reduction of a defendant's sentence for a particular offense. (*Cervantes*, *supra*, 9 Cal.App.5th at pp. 601-602*.)* In *Brown*, the court held that a statutory change that temporarily increased conduct credits for prisoners did not apply retroactively. (*Brown*, *supra*, 54 Cal.4th at pp. 323-324.) In *Brown*, the Supreme Court distinguished *Estrada* and held that the conduct credits law did "not alter

---

[3] In *People v. Superior Court* (*Lara*), *supra*, 4 Cal.5th 299, the California Supreme Court disapproved of *People v. Cervantes*, *supra*, 9 Cal.App.5th 569, and held that the juvenile transfer provisions of Proposition 57 are retroactive to cases not yet final on appeal.

the penalty for any crime; a prisoner who earns no conduct credits serves the full sentence originally imposed.  Instead of addressing punishment for past criminal conduct, the statute addresses *future conduct* in a custodial setting by providing increased incentives for good behavior." (*Id*. at p. 325.)

But under Proposition 57, a transfer hearing conducted by a juvenile court judge does not address future conduct or provide incentives for good behavior as in *Brown*.  Rather, the potential benefit of a juvenile transfer hearing is that it may, in fact, dramatically alter a minor's effective sentence or "juvenile disposition" for past criminal conduct.  Thus, just as the Supreme Court reasoned in *Estrada* and *Francis*, we infer that the electorate intended the possible ameliorating benefits of Proposition 57 to apply to every minor to whom it may constitutionally apply, including Vela.

2. *Vela is entitled to a juvenile transfer hearing*.

Having found that the statutory amendments under Proposition 57 apply retroactively, we must now address what should happen with Vela's judgment.  Not surprisingly, Vela urges that his convictions should be reversed.  We disagree.  The jury's convictions, as well as its true findings as to the sentencing enhancements, will remain in place.  Nothing is to be gained by having a "dispositional hearing," or effectively a second trial, in the juvenile court.  Vela has already had a jury trial with all the rights afforded to him in that proceeding; 12 jurors found him guilty beyond a reasonable doubt.

On the other hand, the Attorney General argues that the failure to provide Vela with a juvenile transfer hearing constitutes only "harmless error" given the nature of the charges and the underlying facts of this case.  We disagree.  This court is not in a position to evaluate the various factors to be considered at a juvenile transfer hearing such as Vela's "physical, mental, and emotional health at the time of the alleged offenses." (§ 707, subd. (a)(1)(A)(ii).)

27

We will seek to strike a middle ground. An appellate court "may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances." (Pen. Code, § 1260.) "A limited remand is appropriate under section 1260 to allow the trial court to resolve one or more factual issues affecting the validity of the judgment but distinct from the issues submitted to the jury . . . ." (*People v. Braxton* (2004) 34 Cal.4th 798, 818-819.) Indeed, a remand with instructions for the lower court to conduct a limited hearing is not a particularly unusual disposition. (See, e.g., *People v. Lightsey* (2012) 54 Cal.4th 668, 674 [remand for hearing concerning defendant's competency]; *People v. Johnson* (2006) 38 Cal.4th 1096, 1097 [remand for hearing regarding prosecutor's use of peremptory challenges]; *People v. Wycoff* (2008) 164 Cal.App.4th 410, 412 [conditional reversal and remand for review of police personnel records].)

Here, under these circumstances, Vela's conviction and sentence are conditionally reversed and we order the juvenile court to conduct a juvenile transfer hearing. (§ 707.) When conducting the transfer hearing, the juvenile court shall, to the extent possible, treat the matter as though the prosecutor had originally filed a juvenile petition in juvenile court and had then moved to transfer Vela's cause to a court of criminal jurisdiction. (§ 707, subd. (a)(1).) If, after conducting the juvenile transfer hearing, the court determines that it would have transferred Vela to a court of criminal jurisdiction because he is "not a fit and proper subject to be dealt with under the juvenile court law," then Vela's convictions are to be reinstated. (§ 707.1, subd. (a).) The court is to resentence Vela consistent within the bounds of its discretion as discussed within the following section of this opinion. On the other hand, if the juvenile court finds that it would *not* have transferred Vela to a court of criminal jurisdiction, then it shall treat Vela's convictions as juvenile adjudications and impose an appropriate "disposition" within its discretion.

28

*E. Retroactivity of Senate Bill No. 620*

Prior to January 1, 2018, trial courts did not have authority to dismiss or strike a firearm sentencing allegation under sections 12022.5 or 12022.53. (Former § 12022.5, added by Stats. 2010, ch. 711, § 5 and amended by Stats. 2017, ch. 682, § 1, eff. Jan. 1, 2018; former § 12022.53, added by Stats. 2010, ch. 711, § 5 and amended by Stats. 2017, ch. 682, § 2, eff. Jan. 1, 2018.)

Effective January 1, 2018, the Legislature amended sections 12022.5 and 12022.53 to add the following language: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (§§ 12022.5, subd. (c); 12022.53, subd. (h).)

Vela contends that the recent amendments to sections 12022.5 and 12022.53 apply retroactively to cases not yet final on appeal. (*Estrada*, *supra*, 63 Cal.2d at pp. 742-748; *Francis*, *supra*, 71 Cal.2d. at pp. 75-76.) The Attorney General concedes the argument and we agree. In short, Senate Bill No. 620 provides an opportunity for Vela to receive a more lenient sentence; because the judgment is not yet final on appeal, the same rationale regarding retroactivity applies as in our previous discussion regarding Proposition 57.

Here, the jury found true the allegation that during the commission of the gang-related murder and attempted murder, another principal intentionally discharged a firearm causing death and great bodily injury. (Pen. Code, §§ 186.22, subd. (b)(1), 12022.53, subds. (d) & (e)(1).) The trial court imposed a mandatory sentence of 25 years to life. If, on remand, the juvenile court transfers the matter to the criminal court, that court has the discretion to strike or dismiss the firearm allegation.

IV

DISPOSITION

The judgment of the criminal court is conditionally reversed. The cause is remanded to the juvenile court with directions to conduct a transfer hearing as discussed within this opinion, no later than 90 days from the filing of the remittitur. If, at the transfer hearing, the juvenile court determines that it would have transferred Vela to a court of criminal jurisdiction, then the convictions shall be reinstated as of that date. The criminal court is then directed to conduct a resentencing hearing and a "*Franklin* hearing" within 30 days as discussed within the unpublished portion of this opinion.

If, at the transfer hearing, the juvenile court determines that it would not have transferred Vela to a court of criminal jurisdiction, then Vela's criminal convictions and enhancements will be deemed to be juvenile adjudications as of that date. The juvenile court is then to conduct a dispositional hearing within its usual time frame.


MOORE, J.


WE CONCUR:


BEDSWORTH, ACTING P. J.


THOMPSON, J.


30