Filed 2/17/26  In re R.A. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re R.A., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>R.A.,<br><br>        Defendant and Appellant. | A171676<br><br>(San Francisco City & County Super. Ct. No. JW08-6779) |

R.A. appeals from an order transferring his case from juvenile court to adult criminal court pursuant to Welfare and Institutions Code section 707.[1] R.A. argues the transfer order must be reversed because in determining whether transfer was appropriate, the juvenile court incorrectly applied the specified criteria in section 707, subdivision (a)(3) (section 707(a)(3)) as it was recently amended.  We disagree and we affirm.

---

[1]    Further undesignated statutory references are to the Welfare and Institutions Code.

1

# BACKGROUND

## The Facts of the Underlying Offenses

We take the facts for our prior unpublished opinion in R.A.'s direct appeal.  (*People v. [R.A.]* (Oct. 2, 2015, A140128) [nonpub. opn.].)[2]

"[R.A.] and [co-defendant M.R.] were members of the MS–13 gang.  MS stands for Mara Salvatrucha, a reference to El Salvador; 13 represents MS–13's affiliation with Sureño.  On July 30, 2008, the father of MS–13 gang member 'Pistolita' (Pistolita) was shot by a member of the Norteño, a rival gang, and some MS–13 gang members quickly met to plot revenge.  The MS–13 members who met included [R.A.], [M.R.], Acosta, Cesar Alvarado ('Momia'), Walter Chinchilla ('Demonio'), and Pistolita.

"Some specifics concerning the revenge meeting were confirmed by the testimony of Jose ('Chiqui') Espinal, another MS–13 gang member, who testified in exchange for a letter of recommendation to the federal judge before whom Espinal had pleaded guilty to five charges.  Espinal testified that in 2008 Pistolita's father was shot during a confrontation with rivals who sold fake green cards in the Mission District.  When MS–13 gang members learned that Pistolita's father had been shot, they attributed the shooting to Norteños, and planned to retaliate.  Asked how he knew, Espinal testified he was 'there when it was planned.'  Sometime after the meeting, Espinal phoned [M.R.] and told him to get ready, as other gang members would come by to pick him up.  Espinal himself had to go to work.

"Early the next morning, July 31, at approximately 1:15 a.m., 14–year–old Miranda left his house to meet his 17–year–old friend Linares, telling his father he was going to return Linares's iPod.  Miranda met Linares and her

---

[2]    We previously granted R.A.'s request to take judicial notice of the record filed in the prior appeal.

2

friend, Flores, at the intersection of Persia Avenue and Lisbon Street at about 1:30 a.m. Miranda had red shoelaces in his sneakers, the color associated with the Norteño gang.

"The three of them walked toward Linares's house, when Linares noticed four men approaching. The men walked past them at first, then turned back and headed toward them. Flores recognized one of the four men as [M.R.], who went to the same school as he and his companions. Flores noticed a fifth man who seemed to be texting or calling someone.

"When the four approached, they produced knives, one of them said, 'check them,' and asked whether Miranda and the others had iPods or phones, which they then took. Two of the men held knives against Flores, one of whom flashed an MS–13 gang sign. Two others, including [M.R.], pointed knives at Miranda, who broke free and ran, pursued by two gang members. Moments later, Linares and Flores saw Miranda on the ground, stabbed in the chest, neck, arm, and back. Miranda was taken to San Francisco General Hospital, where he died from his stab wounds. The iPod he brought to the scene was never recovered.

"A little after 1:30 a.m., Espinal called [M.R.] and asked him 'what's up.' [M.R.] said 'a little fish had fallen'—'that long hair little guy from school . . . Ivan Dude.'

"On July 31, the day of the murder, [R.A.] contacted Acosta, a fellow gang member who was also a tattoo artist, told him about the murder, said that he and [M.R.] had earned gang tattoos for the murder, and asked him to tattoo them. Acosta did that. And much more. [¶] . . . [¶]

"Acosta was a confidential informant who had for some three years been working with the Department of Homeland Security (DHS), in a relationship with Agent John Moore. Using a concealed digital recorder

3

provided to him by the DHS, Acosta recorded conversations with MS–13 gang members [R.A.] and [M.R.] (along with Demonio) regarding the murder of Miranda . . . .

"Acosta made the recordings while riding in a car with defendants the day of the murder and at a tattoo session later that same day.  Both of the recordings were in Spanish and were played in segments for the jury, while Acosta, through an interpreter, testified to their content and identified the various speakers.  For each recording, the jury was provided with two transcripts introduced in the People's case, a first draft and a final draft, which contained the statements in Spanish, each statement's speaker, and a side-by-side English translation of each statement.  [¶] . . . [¶]

"In the transcript from the recording of the conversation during the car ride, the following translated statements were attributed to [R.A.], each statement referring to the events of the previous evening and the murder of Miranda.  [*Any changes in statements between the first and final draft are indicated*.]

"• 'We stabbed that son of a bitch' [*final draft*: 'We took that son of a bitch down from side to side']

"• 'The dude just fell and died right in front of, right in front of the homeboy dog.'  [*final draft*: 'The dude just fell stretched out right in front of, right in front of the homeboy dog.']

"• 'I had like a, a Chinese style sword dog.'

"• 'And I positioned it crazy, and it just slid in, like this!'

"• '. . . I even felt my hand go in dog."

"• 'I stuck it all the way in dude, right here, look!'

"• 'We were following him to stab him even more dude.'

"• 'I stabbed him, I stabbed him like 3 times in the heart and then I

4

stabbed him a bunch of times back here crazy.' [*final draft*: 'I stuck him, I stuck him like three times in the heart, and then I stuck him a bunch of times back here crazy.']

 "• 'Look here, I got 80 bucks for the iPod dog'

 "• Fuck that's what I like doing dude, right? Robbing mother fuckers.' [*final draft*: 'Fuck that's what I like doing dude, right? Searching mother fuckers.']

 "According to Acosta, [M.R.] was also in the car during these discussions and the following statements were attributed to him:

 "• 'We even hide the knife.'

 "[R.A.] interjected: 'We have to go get that shit dog.']

 "• [M.R.]: 'Yeah dude because all my fingerprints are on it since I didn't wear gloves.'

 "• 'Hey, what made me laughs is how he went down; he even closed his legs, and then dropped dead, like this look! [LAUGHS].' [*final draft*: 'Hey, what made me laugh is how he went down; he even closed his legs, and then dropped, balled up, like this look! [LAUGHS].']

 "Later in the car ride recording, Acosta identified [M.R.] as saying that Linares and Flores, the two people with Miranda the night of his murder, recognized [M.R.] from school, as Flores apparently asked [M.R.], ' "Why are you checking me if I know you?" ' In the car, Acosta asked [M.R.], 'The guy recognized you?,' to which [M.R.] responded, 'Yes, yes, he saw my face . . . we went to school together and we got into a fight once there too.' Here, [R.A.] jumped in to say 'Yeah, I went to school with them too dog.'

 "In the second recording, at the house where Acosta tattooed [R.A.] and [M.R.], Acosta identified [M.R.] as saying: 'This dude, these dudes fucked up because all they did was take [Miranda's] iPod and slightly stabbed him, and

[Flores] recognized me, he is out with the narcs right now.' [M.R.], Acosta, and [R.A.] (along with a few other members of the gang) go on to discuss having someone vouch for their whereabouts the night of the crimes, in order to provide alibis for each of them." (*People v. [R.A.]*, *supra*, A140128, italics omitted.)

### Proceedings Leading Up to the 2024 Transfer Hearing

In October 2008, the People filed a juvenile warship petition under section 602, charging then 17-year-old R.A. with the murder of 14-year-old Ivan Miranda (Pen. Code, § 187); robbery of Miranda (*id.*, § 211); robbery of Alejandro Flores (*ibid.*); and attempted robbery of Natalie Linares (*id.*, §§ 211, 664). The petition alleged that R.A. committed all counts for the benefit of criminal street gang (*id.*, § 186.22, subd. (a)), and that he personally used a deadly weapon in committing both the murder and robbery of Miranda (*id.*, § 12022.2, subd. (b)(1)).

In March 2010, the juvenile court held a hearing on whether to transfer R.A. to criminal court under former section 707. The court concluded R.A. was "not a fit and proper subject" for juvenile court and, accordingly, remanded him to criminal court for further proceedings and dismissed the juvenile petition.

In criminal court, the People charged R.A. with: (1) first degree murder of Miranda (Pen. Code, § 187); (2) robbery of Miranda (*id.*, § 211); (3) robbery of Flores (*ibid.*); (4) attempted robbery of Linares (*id.*, §§ 211, 664); (5) participation in a criminal street gang (*id.*, § 186.22, subd. (a)); (6) conspiracy to commit assault with a deadly weapon (*id.*, § 182, subd. (a)(1)); and (7) conspiracy to obstruct justice (*id.*, § 182, subd. (a)(5)). All charges except count five were alleged to have been committed for the benefit of a criminal street gang. (*Id.*, § 186.22, subd. (b).) The information further alleged that

6

R.A. personally used a deadly weapon in the commission of the murder and robbery of Miranda. (*Id.*, § 12022, subd. (b)(1).) (*People v. [R.A.]*, *supra*, A140128.)

In July 2013, a jury R.A. found guilty on all six charges presented (the People dismissed count seven). The jury found true the gang enhancements. It also found true the weapon use enhancements as to counts one and two, but not true as to counts three and four.

In September 2013, the criminal court sentenced defendant to 25 years to life in state prison for the murder, plus 10 years for the gang benefit enhancement, for a total term of 35 years to life.

R.A. appealed. In October 2015, we affirmed the judgment but modified the sentence to delete the ten-year gang enhancement. (*People v. [R.A.]*, *supra*, A140128.)

In 2016, California voters approved Proposition 57, the Public Safety and Rehabilitation Act of 2016 (Proposition 57) (Cal. Const., art. I, § 32), a measure that amended the law to eliminate the People's ability to directly file charges against minors in criminal court and instead require them to file such charges in juvenile court. (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 305 (*Lara*).) Under the proposition, minors may be tried and sentenced in criminal courts " 'only after a juvenile court judge conducts a transfer hearing to consider various factors such as the minor's maturity, degree of criminal sophistication, prior delinquent history, and whether the minor can be rehabilitated.' " (*Lara*, *supra*, 4 Cal.5th at p. 305, quoting *People v. Vela* (2017) 11 Cal.App.5th 68, 72 (*Vela*) and former § 707, subd. (a)(1).) Proposition 57 also removed the presumption of unfitness to be tried as a juvenile that previously attached to the alleged commission of certain offenses. (See *Lara*, at p. 314.) Our Supreme Court in *Lara*, *supra*, 4 Cal.5th

7

at p. 303 held that Proposition 57 applies retroactively to cases that had already been filed by November 2016 when the new law took effect.  In *People v. Padilla* (2022) 13 Cal.5th 152, 158, 170 (*Padilla*), the Supreme Court extended the retroactivity of Proposition 57, holding that it "applies during resentencing when a criminal court sentence imposed on a juvenile offender before the initiative's passage has since been vacated."

Subsequently, section 707, which sets forth the procedures for transferring a minor from juvenile court to criminal court, was amended several times.  As relevant here and discussed more fully below, effective January 1, 2023, Assembly Bill No. 2361 (2021–2022 Reg. Sess.) (Assembly Bill No. 2361) amended section 707 to provide that in order to transfer a minor to criminal court, the juvenile court "shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court."  (Stats. 2022, ch. 330, § 1; § 707(a)(3).)

In October 2023, the criminal court granted R.A.'s petition for resentencing under Penal Code former section 1170, subdivision (d) based on a letter from the California Department of Corrections and Rehabilitation (CDCR).  The criminal court vacated R.A.'s sentence and ordered the matter returned to the juvenile court to conduct a retroactive transfer hearing pursuant to *Padilla*.

### The 2024 Transfer Hearing

The juvenile court held the second transfer hearing over multiple days, commencing on August 7, 2024, with the court's ruling issued on October 29, 2024.  R.A. was 33 years old at the time of the proceedings.

#### *The People's Evidence*

Prior to the transfer hearing, the deputy probation officer prepared a report recommending transfer.  The court admitted the report into evidence

8

and the supervising probation officer testified to its contents and her concurrence with the opinions therein.  We now summarize the report.

R.A. was born in Honduras.  His parents never married, and he lived with them until he was about six years old.  His father abused drugs and alcohol and physically abused both R.A. and his mother.  When R.A. was six years old, his mother left to the United States and sent him to live with his grandmother.  R.A.'s mother returned to Honduras years later, and when he was 10 years old, both he and his mother left Honduras and went to live in San Francisco.  R.A.'s mother married his stepfather, and they had two children together.

R.A. was "initially fine" when he arrived in the United States, but "problems began" when he was in middle school.  He dropped out of school when he was in the eighth grade.  At age 13, R.A. began smoking marijuana and cigarettes and using cocaine.

R.A. and his family relocated to Texas because of his mother's concern that R.A. had become involved with gangs.  He was enrolled in high school but did not complete the ninth grade.  R.A. ran away from home and returned to San Francisco on multiple occasions, and his mother had to pick him up to take him back to Texas.  When R.A. was 16 years old, he experimented with crystal meth and starting drinking alcohol.  He also was involved in a gang-related assault, which, in prior juvenile court proceedings, he admitted as true, and for which he was adjudicated a ward, placed on probation, and released to his mother's home in Texas.

When R.A. turned 17 years old, his mother could no longer stop him from leaving their home in Texas.  On one occasion when R.A. ran away from home, he was found in a park in San Francisco along with gang members.  Police picked him up and took him to a shelter, but he absconded the same

9

day.

In the transfer report, the probation department recommended transfer to criminal court on the basis of four of the five criteria contained in section 707(a)(3): the degree of criminal sophistication exhibited by the minor, whether the minor could be rehabilitated before expiration of the juvenile court's jurisdiction, the minor's previous delinquency history, and the circumstances and gravity of the offenses. As to the fifth criterion—the success of previous attempts by the juvenile court to rehabilitate the minor— the probation officer contended that it weighed against transfer because R.A. was never offered services from which he would have benefited, including counseling, gang prevention services, and individual and family therapy.

The report continued: "despite this case, [R.A.] continued to have gang involvement while in custody . . . threatening staff to have someone from the outside put a bullet in the counsel's head. . . . [¶] For the majority of the past 16 years [R.A.] has been in custody, [he] remained submerged in his gang's activities, doing very little in the way of rehabilitation or even doing anything productive. [¶] To his credit, he has completed substance abuse counseling, a non-violence course, anger management and has been baptized. This has all occurred within the last 1.5 years-2 years, except for the Non-Violence course, which was completed approximately 5 years ago. [¶] The fact that he has wasted approximately 13-14 years of his incarceration steeped in gang activities which placed him behind bars, is an indication that he has done the bare minimum towards being rehabilitated. [¶] There is much still to be gained in the way of rehabilitation that is offered by the CDCR. There are programs within the CDCR that the non-minor can take advantage of. [¶] . . . [¶] . . . [R.A.], although incarcerated continued his gangster ways for the majority of the time he has been incarcerated, only showing any evidence at

10

significant efforts to rehabilitate in 2022. There is absolutely no significant evidence that demonstrates that the nonminor is ready to rehabilitate outside of the CDCR." The report concluded, "Releasing the non-minor to the community is a danger to the community due to the lack of rehabilitation that has been made, it is also a danger to the non-minor himself."

In addition to the probation report and testimony of the supervising probation officer, the People called an officer with the San Francisco County Sheriff's office, who testified that R.A. had numerous gang tattoos while in custody in the San Francisco County Jail in September 2023.

### *The Defense's Evidence*

In his written opposition to transfer filed before the transfer hearing, R.A. argued that the five statutory criteria "strongly support retention in the juvenile court." The defense retained a clinical and forensic psychologist, Francesca Lehman, Psy.D., to conduct a psychological evaluation of R.A. Dr. Lehman prepared a report regarding that evaluation and testified on R.A.'s behalf as an expert in clinical and forensic psychology, as well as childhood development with a specialization in adverse childhood experiences. Dr. Lehman's observations and opinions from her reports and her testimony included the following.

Concerning R.A.'s developmental and social history, R.A. reported that he was exposed to pervasive violence and criminality while living in Honduras, including witnessing his grandfather's murder and engaging with gang-involved family members. R.A. was sexually abused by a neighbor when he lived with his paternal grandmother. And he was physically abused by his father, who would become violent after drinking and using cocaine. During one incident, R.A.'s father attempted to drown R.A. R.A. also stated his mother began physically abusing him when he was 12 years old.

11

R.A. began associating with gang members after moving to the United States. Six months after he arrived, he joined MS-13. R.A. identified protection, a lack of friends, and little connection to his family as his reasons for joining the gang.

R.A. struggled with substance abuse. He started drinking alcohol at age 9 or 10, smoking marijuana at age 14, using heroin at age 18 or 19, and using amphetamines and methamphetamines shortly before committing the underlying offenses. R.A. participated in a few substance abuse programs while incarcerated and reported five years of sobriety as of the time of Dr. Lehman's evaluation.

Dr. Lehman then summarized R.A.'s "Reentry Plan," stating that R.A. had "put great effort into preparing for release, including identifying and beginning to enroll in reentry services" such as a housing program, employment and financial assistance, substance abuse recovery support, and tattoo removal.

With respect to R.A.'s psychological history, Dr. Lehman reported that his psychological development was significantly impacted by parental separation, exposure to domestic violence, drug abuse, traumatic experiences, and emotional abuse by his father. R.A. also had a history of depression and suicide attempts.

Dr. Lehman also recounted R.A.'s psychological evaluation conducted by Dr. Francisco Gomez, Jr., for the first transfer hearing in 2010. Dr. Gomez opined at the time that R.A. "is an individual who suffers from cognitive deficits that affect his impulse control, ability to appreciate the consequences or his behavior, judgment, insight into his behavior, and ability to focus. Moreover, he has had poor parental supervision and guidance, experienced psychological trauma and abuse, which has affected his

12

emotional maturity and social judgment. He is not an individual that takes the initiative and does not have the cognitive abilities to properly assess his options in stressful situations. Thus, he is vulnerable to manipulation and coercion in situations of duress or following others." (Italics omitted.)

Between 2016 and 2022, R.A. had completed several programs, including substance abuse programs, an anti-recidivism class, adult education, and Criminals and Gang Members Anonymous. In June 2018, R.A. dropped out of MS-13.

Dr. Lehman also noted that in 2014, when R.A. was 20 years old, he committed a violent infraction in prison, a gang-related stabbing.

Dr. Lehman evaluated the five criteria in section 707(a)(3) and based on that evaluation, recommended that R.A.'s case "should be remanded to juvenile court."

The defense also retained Roberto Luca, a former gang member who testified on R.A.'s behalf as an expert on gang recruitment, gang culture in the prison system, gang abatement, and gang programming specific to transitioning former gang members into the community. Luca testified as to the following.

Gangs target individuals who are more susceptible to the influence of a gang, including those without guidance, and then guide them into criminal activity. R.A. was a good target because he did not have structure, was not in school, and was roaming the streets. Gangs indoctrinate the targeted youth into the culture, values and rituals of the gang. R.A. was such a youth. He was ushered into the gang, made to feel protected, and was fed and clothed like family. All the while R.A. witnessed acts of violence and the structure of the gang. Then, as part of the initiation process, he was asked to participate in a criminal act to benefit the gang. Advancement in the gang is promoted

13

through intimidation, fear, and violence. Peer pressure exists because persons like R.A. are trying to find acceptance into a group, and when they do not commit crimes or follow orders, there will be consequences including ostracism, physical harm, or death.

In the CDCR, R.A. was placed with active MS-13 gang members where he was further subject to indoctrination. He was taught the gang rules in prison and the repercussions that result from failing to follow them. Dropping out can result in being placed on a "greenlight list," requiring any member from any California gang to assault or kill the member dropping out.

Based on his conversations with R.A., Luca believed that R.A. had absorbed the message of Criminal and Gang Members Anonymous, understood "how the impact of his crime[s] rippled throughout his community," and was on the path to rehabilitation.

In addition to the above, the defense retained Kelly Ryan, who testified an as expert on cultural conditions and gang abatement in Honduras. Ryan testified about hardships and traumatic situations for children growing up in Honduras. Factors that contribute to someone becoming involved in a gang include experiencing trauma and abuse, living in a gang-controlled neighborhood, and substance abuse. She also testified that it is common for Hondurans who have a parent who has left for the United States to wind up in gangs. After interviewing R.A., Ryan believed that R.A. experienced factors that made him susceptible to gang involvement. However, during cross-examination, Ryan acknowledged that not all children who suffer from trauma in Honduras end up joining a gang.

### *The People's Rebuttal*

The prosecution called forensic neuropsychologist, Dr. Rachyll Dempsey, who qualified as an expert in forensic neuropsychology and

14

psychological testing and assessment, including in the prison system. Dr. Dempsey was asked about the psychological evaluation conducted by Dr. Gomez for the first transfer hearing in 2010, which evaluation he had to amend twice. Although Dr. Gomez found R.A. to have a full scale IQ of 71, Dr. Gomez underestimated R.A.'s executive functioning, meaning his ability to problem solve, plan, and manage impulses. On these tests, R.A. generally scored in the average to low-average range. Dr. Dempsey opined that Dr. Gomez's evaluation was not valid because of these mischaracterizations and because he administered some tests to R.A. in English instead of Spanish.

### *The Juvenile Court's Ruling*

On October 29, the juvenile court issued a 24-page written decision ordering R.A.'s case be transferred to criminal court. At a hearing on October 29, the court stated on the record the findings and orders contained in its written decision.

In describing the legal standard, the court noted that "under current law, the prosecution now bears the burden of establishing [']by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.' Welf. & Inst. Code § 707(a)(3)." The court also stated: "When the juvenile court conducts a retroactive Proposition 57 hearing in a resentencing case, the juvenile court must determine whether [it] *would have* transferred the case to adult criminal court in accordance with current law.' People v. Lopez (2020) 56 Cal.App.5th 835, 850 (*emphasis added*). Similarly, in a direct filing case where there was no transfer hearing, 'When conducting the transfer hearing, the juvenile court shall, to the extent possible, treat the matter as though the prosecutor had originally filed a juvenile petition in juvenile court and had then moved to transfer [the person's] cause to a court of criminal jurisdiction.' People v.

15

Vela (2018) 21 Cal.App.5th 1099, 1113."

Next, under the section entitled, "Findings," the court addressed each of the five section 707(a)(3) criteria as follows.

The court found the first criterion—the degree of criminal sophistication (§ 707(a)(3)(A)(i))—weighed in favor of transfer. As the court noted, when evaluating this criterion, it "shall give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health at the time of the alleged offense; the minor's impetuosity or failure to appreciate risks and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (§ 707(a)(3)(A)(ii).)

The court first addressed the facts of the underlying crimes, observing that R.A. "planned to seek gang-related revenge . . . , acted with experience . . . and with a degree of viciousness in the robbery and stabbing . . . , attempted to cover up his involvement by trying to hide the murder weapon, and boasted about his crime immediately after." The court added that his boasting was indicative of "an immature understanding of the value of life" and callousness.

The court then considered R.A.'s family and trauma history, acknowledging that as a child he endured physical and sexual abuse and witnessed violence firsthand. The court observed that R.A.'s trauma and childhood experiences made him vulnerable to gang involvement. Eventually, R.A.'s mother and stepfather could no longer control R.A., who

16

stopped going to school and became affiliated with gang members.

As to peer or adult pressure, the court found no credible evidence indicating that R.A. was being controlled by the adults in the gang or that he succumbed to peer pressure when committing the underlying crimes. R.A. "was an equal, if not dominant, participant" in the crimes, which were motivated by an intent to seek revenge on a rival gang. And the court found notable that "two of the overt acts were that [R.A.] stabbed Ivan through the neck and through the heart with a knife."

Turning to R.A.'s maturity and development at the time of the offenses, the court agreed with Dr. Dempsey that the opinions of Dr. Gomez, who had conducted a psychological evaluation of R.A. back in 2010, were not credible. Specifically, although Dr. Gomez found R.A. to have a full scale IQ of 71, the court found that Dr. Gomez underestimated R.A.'s executive functioning, meaning his ability to problem solve, plan, and manage impulses. The court found that Dr. Gomez's evaluation was not valid because of these mischaracterizations and because he administered some tests to R.A. in English instead of Spanish. In addition, the court found that while "[h]allmarks of youthfulness are impetuosity and failure to appreciate consequences, and [R.A.] is not exempt[,] . . . the evidence shows that he is capable of appreciating consequences." Moreover, while substance abuse had been a part of R.A.'s life, it did not appear to play a role in the murder.

In summarizing its findings on the first criterion, the court stated: "At age 17, [R.A.] was deeply entrenched in MS-13 gang and criminal gang activity," going on to conclude that "the mandatory factors considered under this criterion, while illuminating how [R.A.] became an MS-13 member, do not outweigh the degree of criminality and [R.A.'s] commitment to a criminal lifestyle that he demonstrated in this case." The court thus found that the

17

first criterion weighed favor of transfer.

The court, however, found the second criterion—whether R.A. can be rehabilitated prior to the expiration of the juvenile court's jurisdiction 707(a)(3)(B)(i))—weighed against transfer. The court stated that in evaluating this criterion, it was required to "give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature." (§ 707(a)(3)(B)(ii)).) The court considered this criterion from two distinct temporal perspectives: (1) the years leading up to and including the underlying offenses and (2) the present time. With regard to the first, the court considered R.A.'s "deeply entrenched delinquency" and "that he had embraced a criminal lifestyle" at the time of the offenses. The court noted that at the first transfer hearing in 2010, the judge then presiding had found R.A. "amenable for treatment" under the second criterion. The court found that it "cannot conclude by clear and convincing evidence that [R.A.], at the age or 17 or 18, could not be rehabilitated prior to the expiration of the juvenile court's jurisdiction."

The court went on, stating that "[w]hile [it] understands its task to be a determination of whether [R.A.] *would* have been transferred to adult court as a minor under current transfer law, i.e., to address past criminal conduct, the Court will also consider whether [R.A.] can be rehabilitated under the juvenile court's jurisdiction at the present time." And, it noted, the juvenile court retains jurisdiction over persons 25 years old or older like R.A. not more than two years from the date of disposition. (§§ 607, 875.) Accordingly, the court considered whether R.A. "could be rehabilitated under the two year 'control period' if he were retained in juvenile court now."

In doing so, the court noted the probation report's statement that " 'Juvenile Probation has little to nothing that could supplant what CDCR

18

has in terms of security and rehabilitation.' " The court also noted that R.A. started substance abuse counseling in 2016 and reports being sober since 2020 after three documented relapses in 2017 and 2020. He had one violent infraction, a gang-related stabbing, in 2014, when he was 20 years old.

The court then stated it disagreed with gang expert Luca's opinion that R.A. "is already rehabilitated because he took the high risk of renouncing the gang and has sincere awareness of his crime's effect." The court observed that R.A. had "not demonstrated a law-abiding life outside of incarceration." Further, the court noted Luca's opinion "that turning a life around for a gang member in prison is an 'ongoing process' that starts with 'changing thoughts.' " Indeed, the court noted that "[i]n Mr. Luca's case, it took 22 years for him to change."

The court then considered "[t]he array of services proposed in the defense release plan" including "housing, substance abuse treatment, employment services, and tattoo removal." The court "question[ed] the wisdom and viability of post-release housing and services being located in San Francisco" in view of the testimony from defense experts that former gang members who leave MS-13 often face retaliation from the gang for leaving. The court also found that placement outside of San Francisco "obviously raises challenges for Juvenile Probation to supervise [R.A.] in the community."

The court, however, cited the supervising probation officer's testimony that she was " 'unsure' " that R.A. could be rehabilitated within two years, but that the services identified in R.A.'s release plan "have helped in similar cases." In view of all of the above, the court could not "find by clear and convincing evidence that [R.A.] cannot be rehabilitated . . . in two years."

For the third criterion—"the minor's previous delinquent history"

19

(§ 707(a)(3)(C)(i))—the court found it weighed in favor of transfer. It noted that one year before the underlying crimes, R.A. was arrested for a gang-related assault. He was "the main instigator of the fight" that led to R.A.'s fellow gang members kicking and hitting the victim in the head ten to 15 times. The court noted that although that was R.A.'s "only prior juvenile petition, the offense is serious and the prior conduct is similar to the underlying charges, demonstrating [R.A.'s] deepening entrenchment in criminal gang activity in the year preceding Ivan's murder." The court additionally noted that R.A. had admitted being in 30 to 45 gang-related fights in 2008. The court then concluded: "[R.A's] family history, community environment, and childhood trauma tell a familiar story of a young person's pathway to gang involvement. Yet, as Kelly Ryan testified, not everyone from . . . Honduras who has experienced childhood trauma becomes a gang member." Accordingly, the court found the third criterion weighed in favor of transfer.

With respect to the fourth criterion—the success of previous attempts by the juvenile court to rehabilitate the minor (§ 707(a)(3)(D)(i))—the court concluded that the criterion weighed against transfer. The court reasoned that there were no prior efforts to rehabilitate when he was under the jurisdiction of the San Francisco Juvenile Court, as he was " 'placed with relatives in Texas in hopes that he would be removed from negative peers.' " But "[w]hile [R.A.'s] lack of engagement and participation and chronic runaway behaviors certainly hindered prior attempts to rehabilitation, prior services were inadequate."

Finally, as to the fifth criterion—the circumstances and gravity of the offenses (§ 707(a)(3)(E)(i))—the court found it favored transfer. The court found that "[a]lthough participating in a group, it was [R.A.] who actually

20

killed 14-year-old Ivan, stabbing him four times, including through the neck, as well as causing an incised wound on his back. [R.A.] was involved in the pre-planning to seek revenge, 'hunting' for rival gang members with a knife. [R.A.] was involved in the after-planning to cover up the group's involvement."

The court then applied California Rules of Court, rules 4.421 and 4.423, which, respectively, list aggravating and mitigating factors to consider under felony sentencing law. The court found aggravating factors were the great violence, viciousness, and callousness of the crimes; the sophistication in bringing a weapon; Ivan's youth; R.A.'s leadership in the crimes and the crimes' involvement of a younger, minor co-participant; the planning and sophistication in how the crime was committed and covered up; and the increase in violence from the earlier sustained petition. Mitigating factors were R.A.'s early childhood trauma and abuse (which were not evidently factors in the offenses), youth, and immaturity. The court further observed that R.A.'s trauma and social history had a mitigating effect, but not enough to reduce the gravity of the offenses. The court found the fifth criterion weighed in favor of transfer.

After examining the five statutory criteria, the decision ended with the section entitled, "Conclusion," under which the court wrote: "[R.A.'s] degree of criminal sophistication, previous delinquent history, and the circumstances and gravity of the offenses weigh heavily in favor of transfer to adult court. Whether he could have been rehabilitated, or can now be rehabilitated, prior to the expiration of the juvenile court's jurisdiction weighs slightly in favor of his amenability for juvenile court. The lack of adequate previous attempts to rehabilitate weigh in favor of juvenile court.

"The Court must consider the totality of the circumstances in

21

considering all five criteria listed in Welf. & Inst. Code § 707(a)(3); Cal. Rule of Court 5.770.[ ] 'Nothing in section 707 indicates that the juvenile court was required to give equal weight to each of the five criteria or that it would necessarily be an abuse of discretion to find that one criterion outweighed the other criteria.' [Citation.]

"The Court has considered all the criteria and factors in Welf. & Inst. Code § 707(a)(3) and applied the current law.  The district attorney has met his burden of proof."  The court then ordered R.A.'s transfer to criminal court for resentencing.

This appeal followed.

## DISCUSSION

R.A. argues the transfer order must be reversed because the juvenile court failed to apply the proper legal standard in ruling on the transfer request in two ways:  (1) "Failing to Evaluate all of the Five Criteria Through The Lens Of Amenability" and (2) "Applying the *Vela* Analytical Formulation—That it Must Determine Whether [It] '*Would Have* Transferred the Case to Adult Criminal Court.' "[3]  We disagree with both contentions.

---

[3]     R.A. acknowledges that he did not object below to the juvenile court's transfer ruling on either ground.  Nonetheless, he argues that he did not forfeit either contention, because each presents a "pure question of law."  (See *People v. Hines* (1997) 15 Cal.4th 997, 1061 [reviewing court may consider an issue not raised in the trial court where the issue "involves 'a pure question of law which is presented by undisputed facts.' "].)  While certain aspects of R.A.'s arguments do present purely legal issues, such as the interpretation of a statute, some of his arguments essentially attack the court's exercise of its discretion, as explained below.  Thus, we are unpersuaded that his claims on appeal are limited to pure questions of law.  Additionally, R.A. appears to have invited the second claimed error, as he expressly relied on the standard in *Vela, supra,* 11 Cal.App.5th at p. 82 in his motion for release from custody pending the transfer hearing.  (See *People v. Midell* (2025) 113 Cal.App.5th 1060, 1072 [under the invited error doctrine, " ' "when a party by its own

**Legal Framework and Standard of Review**

"Section 707 sets forth the procedures for transferring a minor from juvenile court to criminal court. It provides that whenever a minor aged 16 years or older is alleged to have committed a felony, the prosecutor may move 'to transfer the minor from juvenile court to a court of criminal jurisdiction.' (§ 707, subd. (a)(1).) The prosecution bears the burden of proving that the minor should be transferred. (Cal. Rules of Court, rule 5.770(a).)" (*In re Miguel R.* (2024) 100 Cal.App.5th 152, 164 (*Miguel R.*).)

"The Legislature amended section 707 in 2023 and 2024. Effective January 1, 2023, Assembly Bill [No.] 2361 amended section 707(a)(3) by adding the following italicized language: 'Following submission and consideration of the report, and of any other relevant evidence that the petitioner or the minor may wish to submit, the juvenile court shall decide whether the minor should be transferred to a court of criminal jurisdiction. *In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.* In making its decision, the court shall consider the criteria specified in subparagraphs (A) to (E), inclusive. If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, *which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.*'" (*Miguel R.*, *supra*, 100 Cal.App.5th at

---

conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error." ' "].) In any event, assuming R.A. adequately preserved his claims on appeal, they fail on the merits for the reasons discussed in the text.

p. 164.)

Accordingly, Assembly Bill No. 2361 amended the procedure for transferring a case to adult criminal court in three ways: (1) it raised the prosecution's burden of proof to clear and convincing evidence, (2) it made amenability to rehabilitation while under jurisdiction of the juvenile court "the ultimate question for the court to decide," and (3) it required the juvenile court to state the reasons supporting a finding that the minor is not amenable to rehabilitation. (*In re E.P.* (2023) 89 Cal.App.5th 409, 416 (*E.P.*).)

The five statutory criteria listed in subparagraphs (A) through (E) of section 707(a)(3) were not amended by Assembly Bill No. 2361. (See Stats. 2022, ch. 330, § 1.) Those criteria are: (1) "[t]he degree of criminal sophistication exhibited by the minor"; (2) "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction";[4] (3) "[t]he minor's previous delinquent history"; (4) "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor"; and (5) "[t]he circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (§ 707(a)(3)(A)–(E).) The statute sets forth a non-exhaustive list of relevant factors for the court to consider with respect to each of the five

---

[4] "[T]he ultimate determination of whether 'the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court' (§ 707(a)(3)) is not the same as the second criterion, which calls for consideration of '[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction (§707(a)(3)(B)(i)).' " (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 166.) "[T]he focus of the second criterion is whether there is enough time to rehabilitate the minor while the minor is still eligible to remain under juvenile court jurisdiction." (*Ibid.*) "In contrast, the ultimate finding that the juvenile court must make under section 707(a)(3) concerns a global assessment of the minor's suitability to rehabilitation within the juvenile court system, and not just a comparison of the time needed with the time remaining. (§ 707(a)(3).)" (*Miguel R.*, at p. 167.)

24

criteria. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).) These criteria "are based on the premise that the minor did, in fact, commit the offense." (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 682; *Kevin P. v. Superior Court* (2020) 57 Cal.App.5th 173, 189 (*Kevin P.*).)

Effective January 1, 2024, Senate Bill No. 545 (2023–2024 Reg. Sess.) (Senate Bill No. 545) "amended section 707 to require that with respect to each of those five criteria the juvenile court 'shall give weight to any relevant factor,' including the specific factors listed as relevant to each criterion. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).)" (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 164.) "The previous version of the statute made consideration of those factors discretionary, not mandatory. (Former § 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii), (E)(ii).) With respect to the degree of criminal sophistication, Senate Bill [No.] 545 also added new mandatory factors for the court to consider: whether the minor has had any involvement in the child welfare or foster care system and whether the minor has been 'a victim of human trafficking, sexual abuse, or sexual battery.' (§ 707, subd. (a)(3)(A)(ii).)" (*Miguel R.*, at pp. 164–165; Stats. 2023, ch. 716, § 1.)

"We review the juvenile court's ruling on a transfer motion for abuse of discretion." (*Miguel R.*, *supra*, 100 Cal.App.5th at p. 165.) " 'The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' " (*Ibid*.) To the extent the juvenile court's conclusion requires interpretation of a statute, such issue presents a question of law that we independently review. (*People v. Reynoza* (2024) 15 Cal.5th 982, 989.)

25

**The Juvenile Court Did Not Err In Assessing the Statutory Criteria**

*Evaluation of the Criteria "Through the Lens of Amenability"*

As noted, R.A.'s first argument is that the juvenile court incorrectly applied the section 707(a)(3) criteria because it failed to evaluate the criteria "through the lens of amenability." Specifically, R.A. attacks the court's evaluation of the first, third, and fifth criteria, arguing that it did not explain how its findings of fact as to each of those criteria "render R.A. not amenable to rehabilitation." As he puts in its reply brief, although "the court made ultimate findings rejecting [his] amenability to rehabilitation," the court nonetheless erred because it did not analyze his amenability for rehabilitation "under" the first, third, and fifth criteria. We are unpersuaded.

Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to give effect to the law's purpose. (*People v. Reynoza*, *supra*, 15 Cal.5th at p. 989.) " ' " 'We first examine the statutory language, giving it a plain and commonsense meaning. . . . If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.' " ' " (*Ibid.*) Applying these principles, we conclude R.A. misinterprets section 707(a)(3), as he improperly conflates the individual criteria of section 707(a)(3) with the ultimate determination of amenability.

Section 707(a)(3) as amended by Assembly Bill No. 2361 mandates that in order to transfer a minor to criminal court, the juvenile court "shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." Since the passage of Assembly Bill No. 2361, appellate courts have consistently referred to a juvenile court's finding on amenability as the "ultimate" question for the court to decide at a transfer hearing. (See, e.g., *In re J.S.*

26

(2024) 105 Cal.App.5th 205, 212; *Miguel R.*, *supra*, 100 Cal.App.5th at pp. 164–165; *In re S.S.* (2023) 89 Cal.App.5th 1277, 1288 (*S.S.*); *E.P.*, *supra*, 89 Cal.App.5th at p. 416.)  Assembly Bill No. 2361's amendments to section 707 were intended to "refocus" the juvenile court's assessment and require "[t]he analysis of the five criteria set forth in the statute [to] be focused through the lens of amenability to rehabilitation." (*S.S.*, *supra*, 89 Cal.App.5th at p. 1288.)  Indeed, in making the "ultimate finding" regarding amenability, the statute requires the juvenile court to "consider the criteria specified in subparagraphs (A) to (E), inclusive." (§ 707(a)(3).)  "Thus, according to the statute's plain language, the court is required to consider each of the five listed criteria in determining whether the prosecution has carried its burden of proof to transfer a juvenile to criminal court.".)  (*Miguel R.*, at p. 166.)  Further, as courts have explained, "[t]he amended section 707 requires the juvenile court to *consider all five factors together* in determining whether the minor is amenable to rehabilitation." (*E.P.*, at p. 417, italics added; see *Miguel R.*, *supra*, 100 Cal.App.5th at p. 167 [the "ultimate finding . . . concerns a *global* assessment of the minor's suitability to rehabilitation within the juvenile court system," italics added].)  In short, section 707(a)(3) provides that the evaluation of the five criteria is the means by which the juvenile court reaches, and informs, the ultimate determination of whether the minor is not amenable to rehabilitation.  In other words, amenability is not itself a separate factual finding that supplants the findings regarding the specified criteria.

Here, R.A. concedes that the juvenile court evaluated each of the five criteria.  He also agrees with the People's observations that "that the court articulated the evidence it considered, the evidence it found convincing, the direction it found that each factor tilted the balance, and the weight it gave

27

the five factors as part of a totality of the circumstances approach to making its transfer determination." And based on that comprehensive analysis, as R.A. further concedes, the juvenile court "made ultimate findings rejecting [his] amenability to rehabilitation." In sum, the court's ruling complied with section 707(a)(3), and we thus reject R.A.'s argument that the court erred in failing to evaluate the first, third, and fifth criteria "through the lens of amenability."

### *Application of the* "Vela *Analytical Formulation*"

R.A.'s second argument is that "The Juvenile Court Legally Erred In Applying the *Vela* Analytical Formulation—That it Must Determine Whether the Juvenile Court '*Would Have* Transferred the Case to Adult Criminal Court'—Because it Precluded Proper Consideration of All of the Section 707[(a)(3)] Factors As Required By Assembly Bill 2361." Again, we disagree.

R.A.'s contention is based on *Vela* where the court held that Proposition 57—which took effect in 2016 and among other things eliminated the People's ability to initiate criminal cases against juvenile offenders in criminal court—applies retroactively to juveniles charged directly in criminal court whose judgment was not final at the time it was enacted. (*Vela*, *supra*, 11 Cal.App.5th at p. 71.) Accordingly, Vela—who had been charged and tried as an adult for crimes committed when he was 16 years old and whose appeal was pending when Proposition 57 took effect—was entitled to a transfer hearing. (*Vela*, at pp. 71, 82.) *Vela* conditionally reversed the judgment and remanded with these instructions: "When conducting the transfer hearing, the juvenile court shall, to the extent possible, treat the matter as though the prosecutor had originally filed a juvenile petition in juvenile court and had then moved to transfer Vela's cause to a court of criminal jurisdiction. (§ 707, subd. (a)(1).) If, after conducting the juvenile transfer hearing, the court

28

determines that it would have transferred Vela to a court of criminal jurisdiction because he is 'not a fit and proper subject to be dealt with under the juvenile court law,' then Vela's convictions and sentence are to be reinstated. (§ 707.1, subd. (a).) On the other hand, if the juvenile court finds that it would <u>not</u> have transferred Vela to a court of criminal jurisdiction, then it shall treat Vela's convictions as juvenile adjudications and impose an appropriate 'disposition' within its discretion." (*Vela*, at p. 1113, italics omitted.)

In *Lara*, the Supreme Court approved the remedy set forth in *Vela* for juveniles that had cases pending in criminal court prior to the passage of Proposition 57. (*Lara, supra*, 4 Cal.5th at pp. 309–313.)[5]

Here, as mentioned above, in the section summarizing the legal standard in its written decision, the juvenile court stated that under section 707(a)(3) "the prosecution now bears the burden of establishing [']by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court.[']" The court then cited the *Vela* standard as set forth above.

R.A. argues that the juvenile court erred in applying "the *Vela* analytical formation," which he describes as "requiring a 'backward' hypothetical assessment" that "is incompatible with section 707, as amended by Assembly Bill 2361 . . . . ." R.A. reasons that whereas *Vela* "restricts a court's consideration of facts to those occurring before and during the offense," current section 703(a)(3) requires that "analysis of the [five] criteria

---

[5]     *Lara* cited the original decision issued in *Vela*, which was pending review in the Supreme Court at the time. (See *Lara, supra*, 4 Cal.5th at pp. 306, 310.) The Supreme Court subsequently vacated the original opinion filed in *Vela* and the Court of Appeal refiled a substantially similar decision in *People v. Vela* (2018) 21 Cal.App.5th 1099.

must not be limited to facts before or at the time of the offense, but must also include consideration of material facts beyond the time of the offense and up to the present time of the transfer hearing which bear on those criteria." R.A. goes on to argue that in this case "[t]he *Vela* remedy unlawfully tainted" the juvenile court's "proper consideration" of the first and third criteria of section 707(a)(3) because it failed to consider "material facts beyond the time of the offense," namely that he had dropped out of and repudiated his gang in 2018. This is so, R.A. contends, even though he acknowledges that the court considered that very evidence when evaluating the second criterion.

R.A.'s argument is somewhat convoluted, but the gravamen of it appears to be that the juvenile court should have considered facts that occurred after R.A.'s underlying offenses in 2008—i.e., that R.A. had renounced his gang affiliation in 2018—when evaluating the first and third statutory criteria, not just the second criterion. We find no merit in this contention.

As an initial matter, we are unpersuaded by a premise of R.A.'s argument that *Vela* (and thus *Lara*) "restricts a court's consideration of facts to those occurring before and during the offense." As quoted above, the *Vela* court remanded the matter for the juvenile court to conduct a transfer hearing with the following instructions: "When conducting the transfer hearing, the juvenile court shall, to the extent possible, treat the matter as though the prosecutor had originally filed a juvenile petition in juvenile court and had then moved to transfer Vela's cause to a court of criminal jurisdiction. (§ 707, subd. (a)(1).) If, after conducting the juvenile transfer hearing, the court determines that it *would have transferred* Vela to a court of criminal jurisdiction because he is 'not a fit and proper subject to be dealt with under the juvenile court law,' then Vela's convictions are to be

30

reinstated.  (§ 707.1, subd. (a).)" (*Vela*, *supra*, 11 Cal.App.5th at p. 1113, italics added.)

The phrase "would have transferred" (or "would not have transferred") in *Vela* does call for looking "backward" in the sense that it instructs juvenile courts in certain cases to retroactively apply Proposition 57—i.e., to afford some defendants a hearing to have their amenability to juvenile adjudication considered retrospectively under the new standards of Proposition 57.  But this does not mean that *Vela* was also saying that a juvenile court making such a determination is "restrict[ed]" to "consideration of facts to those occurring before and during the offense."  To the contrary.

*Vela* instructed the juvenile court to decide whether to transfer a case under the then current legal standards.  (See *Vela*, *supra*, 11 Cal.App.5th at p. 82 ["If, after conducting the juvenile transfer hearing, the court determines that it would have transferred Vela to a court of criminal jurisdiction because he *is* 'not a fit and proper subject to be dealt with under the juvenile court law,' then Vela's convictions and sentence are to be reinstated," italics added], citing former § 707.1, subdivision (a).)  And the standards at the time included former section 707, subdivision (a)(2), which set forth the five criteria to consider in ruling on a transfer request (criteria that, we note, remained unchanged after the passage of Assembly Bill. No. 2361, with several exceptions).  (See *Vela*, at p. 72 [under Proposition 57, certain categories of minors such as Vela "can still be tried in criminal court, but only after a juvenile court judge conducts a transfer hearing to consider various factors such as the minor's maturity, degree of criminal sophistication, prior delinquent history, and whether the minor can be rehabilitated," citing former § 707, subd. (a)(1)].)  As is true under current law, the criteria under that earlier version of section 707 focused on different areas, with some of

31

them focusing on the time of the offense. For example, the first criterion regarding criminal sophistication included consideration of "the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health *at the time of the alleged offense*" (former § 707, subd. (c)(3)(A)(ii), italics added), and the fifth criterion was the "circumstances and gravity *of the offense alleged*" (*id.*, subd. (a)(2)(E)(i), italics added). But other criteria focused on different areas, not just the time of the offense. For example, the second criterion was "[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction" (*id.*, subd. (a)(2)(B)(i)), which includes consideration of "the minor's potential to grow and mature" (*id.*, subd. (a)(2)(B)(ii)). And the third criterion—previous delinquent history (former § 707, subd. (a)(2)(C)(i))—has been interpreted to refer to delinquent conduct previous to the transfer hearing, and not just previous to the underlying offenses. (See *D.C. v. Superior Court* (2021) 71 Cal.App.5th 441, 451–456.) Accordingly, R.A. fails to establish that *Vela* "restrict[ed] a court's consideration of facts to those occurring before and during the offense."

But even assuming for argument's sake that R.A.'s interpretation of *Vela* were correct, we would reject his contention that the court improperly assessed the statutory criteria by purportedly ignoring the evidence about his gang affiliation renouncement.

It is true that the court's discussion of the legal standard in its written decision mentioned the standard in *Vela* with which R.A. takes issue. However, within its discussion of the second criterion (rehabilitation prior to expiration of the juvenile court's jurisdiction), the court explained: "While the court understands its task to be a determination of whether [R.A.] *would have* been transferred to adult court as a minor under current transfer law, i.e., to address past criminal conduct, the Court will also consider whether

32

[R.A.] can be rehabilitated under the juvenile court's jurisdiction at the present time." And the court did so, assessing whether R.A. could have been rehabilitated, as of both the time of the offenses and the transfer hearing. As to the latter inquiry, the court expressly considered evidence that R.A. had renounced his gang affiliation and the defense experts' opinions regarding R.A.'s rehabilitation. Indeed, the court considered this and other evidence before finding that the second criterion weighed *against* transfer.

This leads us to R.A.'s contention that although the court considered evidence of his gang renouncement under the second criterion, it nonetheless erred because it did not also consider that evidence under either the first criterion or third criterion. R.A. complains that the court "did not consider [that evidence] when it may have mattered most: evaluating criminal sophistication through the lens of amenability . . . ." Similarly, R.A. argues that consideration of those "significant material facts showing amenability to rehabilitation" is the analysis "through which [the third criterion] must be evaluated." This argument is unavailing.

To the extent this is a rehash of R.A.'s first claim of error that the juvenile court erred in failing to assess certain of the individual criteria "through the lens of amenability," we reject it for the reasons discussed above. R.A.'s contention is also untenable because it effectively confuses the second criterion with the first and third criteria.

The first criterion is "the degree of criminal sophistication exhibited by the minor." (§ 707(a)(3)(A)(i).) And section 707(a)(3)(A)(ii) provides that when evaluating this criterion, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's age, maturity, intellectual capacity, and physical, mental, and emotional health *at the time of the alleged offense*; the minor's impetuosity or failure to appreciate risks

33

and consequences of criminal behavior; the effect of familial, adult, or peer pressure on the minor's actions; the effect of the minor's family and community environment; the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery on the minor's criminal sophistication." (Italics added.) "The criminal-sophistication criterion 'requires a juvenile court . . . to consider the whole picture, that is, all the evidence that might bear on the minor's criminal sophistication, including any criminal sophistication manifested in the present crime.' " (*Kevin P.*, *supra*, 57 Cal.App.5th at p. 192.) Thus, as noted above, a reasonable construction of the first criterion is that it focuses on facts and circumstances existing at the time of the alleged offense(s) (see *D.C. v. Superior Court, supra,* 71 Cal.App.5th at p. 452) bearing on the minor's criminal sophistication.

The third statutory criteria is "[t]he minor's previous delinquent history." (§ 707(a)(3)(C)(i).) When evaluating this criterion, "the juvenile court shall give weight to any relevant factor, including, but not limited to, the seriousness of the minor's previous delinquent history and the effect of the minor's family and community environment and childhood trauma on the minor's previous delinquent behavior." (§ 707(a)(3)(C)(ii).) As noted above, "previous" has been interpreted to mean previous to the transfer hearing, so the juvenile court may properly consider conduct the minor engaged in after the offense, but before the transfer hearing. (*D.C. v. Superior Court*, *supra*, 71 Cal.App.5th at pp. 451.) And "delinquent history" does not refer only to conduct resulting in a delinquency petition but also to any previous delinquent conduct. (See *id.* at p. 453.)

In contrast to the first and third criteria, which focus, respectively, on

34

the minor's *criminality* and previous *delinquency*, the second criterion patently focuses on the minor's amenability to *rehabilitation*. (See § 707(a)(3)(B)(i) ["[w]hether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction"]; § 707(a)(3)(B)(ii) ["When evaluating the [second] criterion . . . , the juvenile court shall give weight to any relevant factor, including, but not limited to, the minor's potential to grow and mature."].)

Out of the three criteria discussed above, evidence regarding R.A.'s repudiation of his gang affiliation is most relevant to the second criterion, since, as R.A. claims, it goes to whether he is amenable to rehabilitation. Therefore, it was appropriate for the court to consider such evidence in evaluating the second criterion, rather than the first or third.

In short, R.A. has failed to show the court improperly evaluated the statutory criteria.

Finally, we turn to the People's assertion with which they close their respondent's brief: "As it has been shown that the court did not commit the analytical errors [R.A.] ascribes, it is clear that [R.A.'s] concern is only with the court's exercise of discretion." We agree. The People's observation is made evident by R.A.'s contentions such as the following, which challenges the court's weighing of the first criterion: "If R.A. was deeply entrenched in criminal gang activity at age 17, how is it he was not amenable to rehabilitation then or now, many years later having debriefed and exited the gang? If R.A. acted in a criminally sophisticated manner then, how did that make him not amenable to rehabilitation then and now at age 33?" To the extent R.A. requests that we independently review the record, reweigh the evidence, and reweigh some or all of the five criteria in a manner contrary to that done by the juvenile court, we decline the invitation. "The existence of

35

evidence supporting [R.A.'s] position does not demonstrate that the juvenile court abused its discretion. Our role is not to substitute our judgment for that of the juvenile court or reweigh the evidence. ' " ' "The appropriate test for abuse of discretion is whether the [juvenile] court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " ' " (*In re J.P.* (2019) 37 Cal.App.5th 1111, 1123.) Here, R.A. does not challenge the sufficiency of the evidence to support the juvenile court's findings and conclusions. Indeed, with respect to the court's findings on the first criterion, R.A. appears to concede that the court's "findings of fact are supported by the record." R.A. also fails to show, and we do not find, that the court's weighing of the statutory criteria and "ultimate findings rejecting [his] amenability to rehabilitation" were arbitrary, capricious, or patently absurd.

In sum, R.A. has failed to demonstrate the juvenile court abused its discretion in transferring his case to criminal court.

## DISPOSITION

The order transferring R.A. to adult criminal court is affirmed.

_____

RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

MILLER, J.

(A171676N)